James **BLOOR**, as Reorganization Trustee of Balco Properties Corporation, Plaintiff,

v.

**FALSTAFF BREWING CORPORATION**, Defendant.

No. 76 Civ. 3231 (CLB).

United States District Court, S. D. New York.

July 6, 1978.

**260**

Weil, Gotshal & Manges by Robert G. Sugarman, Joseph H. Weiss and R. Peyton Gibson, New York City, for plaintiff.

Dickerson, Reilly & Mullen by John H. Reilly, Jr., New York City, and Smathers, Symington & Herlong by John Mullenholz, Washington, D. C., for defendant.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

This action was filed July 21, 1976 to recover monetary damages for breach of contract. Plaintiff James Bloor is the Reorganization Trustee of Balco Properties Corporation, formerly named P. Ballantine & Sons ("Ballantine"). Defendant is the Falstaff Brewing Corporation ("Falstaff"), which on March 31, 1972 bought from Investors Funding Corporation ("IFC") the Ballantine brewing labels, trademarks, accounts receivable, distribution systems and other property, excepting only the Ballantine brewery.

The purchase agreement called for an immediate payment to Ballantine of $4,000,000.00 and royalty payments thereafter of $.50 to be paid on each barrel (31 gallons) of the Ballantine brands sold between April 1, 1972 and March 31, 1978. The contract contained a liquidated damages clause, calling for payments of $1,100,-000.00 a year which were to be made in the event Falstaff "substantially discontinue[d] the distribution of beer under the brand name 'Ballantine'." The contract also required that Falstaff "use its best efforts to promote and maintain a high volume of sales" of the Ballantine brands.

This action arises out of defendant's alleged breach of these covenants by its substantial discontinuance of the Ballantine brands or its failure to use best efforts in their promotion, and also by its failure to pay any royalties whatsoever on sales of those brands after December 1975 and by its alleged underpayment of royalties before that date.

The contract is integrated and provides that it "shall be governed by and construed and enforced in accordance with the laws of the State of New York."

Defendant Falstaff has in turn counterclaimed against the plaintiff, alleging (1) a shortage in the cooperage (beer barrels, now universally made of aluminum) purchased from Ballantine: (2) the illegality and consequent uncollectibility of one of the accounts receivable purchased from Ballantine; (3) the invalidity of Ballantine's claimed ownership of the brand name "Munich"; (4) the moldiness and infestation of eleven carloads of bulk corn grits purchased from Ballantine as a part of the acquired inventory; and (5) Ballantine's fraudulent inducement and misrepresentation in the making of the original contract.

Jurisdiction in this action is founded on the diversity of citizenship of the parties, and is proper under 28 U.S.C. § 1331. Falstaff is a Delaware corporation, with its principal place of business in San Francisco, California; Balco Properties Corporation is a New Jersey corporation, with its principal place of business in New York City.

Trial was held before the Court without a jury on December 12, 13, 15, 19, 20 and 27, 1977. The post-trial briefs and submissions of the parties have been read and considered.

*Beer*

Some preliminary discussion of brewing, the brewing industry in America and some of its current vicissitudes, is essential to a proper understanding of this case.

Generically speaking, "beer" is the name given any alcoholic beverage made by the

fermentation of extracts of various starchy materials, usually grains. The process was known, and was apparently independently developed, in ancient Babylon, Egypt and China, as well as in South Africa, where the Kaffirs made a species of beer from millet. In the Near East, barley was apparently the original grain used for beer. It was buried in pots to allow it to germinate ("malting") and then mixed with water and allowed to ferment through the action of air-borne yeasts. In essence the same process is still used today. All ancient beers contained various herbs to relieve the flatness and sweetness of simple beer. The use of hops for this purpose dates from the 10th century B.C., and is now almost universal. In English-speaking countries the presence or absence of hops originally distinguished beer from ale,[1] but both products now contain hops, and the term "ale" now merely denotes a product with a heartier and more robust flavor.

The Domesday Book (1086) records the existence of some forty-three *cerevisarii* (brewers) then found in England, but the distribution of a brewer's products nationally or internationally is largely a twentieth century, and in the United States specifically a post-World War II, phenomenon.[2] On the trial of this matter, experts testified that it was the exposure of American servicemen and women to the beers produced by the larger breweries under contract to the armed services that began the trend away from the many small, local or regional brewers, each of whom made their own beer with distinctive flavor, towards the few national brewers who produce beers essentially indistinguishable in taste and body.

The biggest single factor contributing to the decline of local and regional brewers has been the enormous market growth, with its consequent efficiency and economy of scale, recently experienced by the "nationals": Miller's, Schlitz, Anheuser-Busch, Coors and Pabst, with Pabst now holding only a precarious position relative to the other four. Although beer consumption in the United States has been rising at approximately 4% per year, the "nationals" have increased their sales by an average of 12% per year, with the difference coming largely out of the sales of the smaller, local and regional brewers. From 1956 to 1966 the nationals expanded their production capacity by some 5.5 million barrels; from 1966 to 1976 they expanded their capacity by more than 75 million barrels and each year produced beer at almost the full capacity constructed the previous year. The cost-effectiveness of full production is obvious, especially in light of the fact, testified to by Mr. Paul Kalmanovitz, Chairman of the Board of Falstaff, that the cost of the ingredients in any two brands of domestic beer is exactly the same, with the exception of coloring materials which might add 2 cents to the cost of a case of beer. It is estimated that by 1980 the nationals will have 80% of the beer market in the United States, a 24% increase over the share held in 1976.

There was expert testimony at trial concerning "general discussion" in the beer industry of the "predatory pricing practices" of the national brewers, although no formal court action has yet been filed against

1. The most recent edition of Encyclopedia Brittanica leaves unresolved the question of which beverage contained hops. In Vol. 3, p. 159 it states that "[o]riginally, hops were used only in ale preparation, and beers were brewed unhopped." In Vol. 1, p. 215, however, the encyclopaedists assert that "ale was until the late 17th Century an unhopped brew of yeast, water, and malt, beer being the same brew with hops added." The articles in the latest Encyclopedia Brittanica are no longer signed by their authors, so we are unable to assign greater weight to either one based on any perceived difference in expertise.

2. Falstaff, and previously Ballantine, produces an ale under the trade name "Ballantine India Pale Ale," which carries in its name a reference to the earliest distribution of malt beverage beyond the brewer's immediate vicinity: the shipment of "India Pale Ale" from England to India on cargo vessels which would otherwise have returned in ballast. According to theory or legend that brew was of such formula and quality as to survive the voyage. Today, all bottled or canned beer can be shipped and sold wherever local law and business conditions allow.

them. It was suggested that several of the nationals may have sold their product in areas, or generally, at a loss for extended periods in order to broaden their market and drive out competition. There is knowledgeable suspicion that some national brewers may have operated their entire malt beverage operations at a loss for these same purposes, while being supported by income from other operations. It is uncontested that the increases in the retail price of beer during the last ten years have lagged considerably behind rises in the cost of its ingredients and the labor to manufacture it.

Advertising has also been a major factor in the growth of the nationals and the decline of local or regional breweries. It was undisputed at trial that, except for "ales" generally and excluding a very few distinctive smaller brews such as Rolling Rock Beer (produced by Latrobe Brewing Co. in Pennsylvania) and Anchor Steam Beer, made in San Francisco since the Gold Rush, all beers appear to be relatively indistinguishable in taste for the average customer. "Image" apparently sells beer, the image of the beer in the marketplace, and the image projected by advertising, of the typical consumer of that brand.[3]

In 1961 it became lawful for the major sports teams to combine to sell network television rights to their games. In an event, such as Monday Night Football, a minute of advertising can cost approximately $100,000.00, with a typical advertising "package" for the whole event costing about $1,400,000.00. For the national brewers such advertising is efficient and inexpensive: they sell beer in the same geographic area covered by the television networks, and the cost of reaching an individual home only amounts to seven-tenths of a cent. The same cost factors make national network advertising unreasonably expensive for the local or regional brewer.

Coupled with these economic factors have been profound changes in the American public's tastes and beer-drinking habits. At the beginning of World War II, two-thirds of the beer consumed in America was drunk in licensed premises or purchased in draft from such premises: the beer bucket was still a familiar household utensil.[4] Now only one-third of all beer is consumed in saloons and bars, and two-thirds is consumed at home. In addition, the taste preference of the American consumer has tended more and more towards clearer, lighter beers and away from "porters," "stouts," and distinctive heavy-flavored beverages. The phenomenal success of Coors Beer is partially attributable to Coors' lightness. In the 1960's several of the nationals, specifically Schlitz and Budweiser, reformulated their product to bring it more in line with current American tastes. Most recently, the brewing industry has been affected by a wave of "light" beers, beginning with Miller's Lite Beer. Falstaff has marketed its version, Falstaff 96 Beer, containing only 96 calories. In 1977 "light" beers accounted for about 7% of total industry production.[5]

The result of all these changes, and the smaller brewers' inability or failure to keep

---

3. "Macho" is a term frequently used by the experts in discussing the prevalent image sought to be fostered by the industry for its brand names. In "blind taste tests" (Ballantine Beer, for example, sampled in Budweiser cans against Ballantine in Ballantine cans) consumers consistently pick the image beer. "Image" has also been a major factor in the inroads expensive foreign beers have made into the American market.

4. In the simpler times it was the custom of laborers at lunch hour or the paterfamilias in the heat of a summer evening to dispatch someone to the corner saloon for beer. The person performing the errand was said to be *rushing the growler* and the *growler*, of course,

was the pail itself. See, 1 W. & M. Morris, *Dictionary of Word and Phrase Origins*, 299 (1962).

5. One additional nail in the coffin of the small brewer has been the increasing use of "no-deposit, no-return" retail beer containers. Originated in the late 1950's, non-returnables are used today to package about 85% of all beer sold. The additional cost of the non-returnable container has had a disproportionate effect on the smaller brewer, whose product is most frequently a "price" or non-premium beer. The deposit bottle gave the local brewer a natural advantage over the national brewer. Its elimination has removed a natural limitation on the size of the geographic market area that the

pace with them, has been the bankruptcy or elimination from the marketplace of many smaller brewers and the decline of the market share held by the local and regional survivors. After Prohibition there were some 866 brewers in the United States. Today there are only 40. Expert testimony at trial suggested that by 1980 there would be only 5 of any importance. Western New York provides in microcosm a view of the whole industry. In the 1890's there were 32 local breweries in Buffalo alone; today only the Fred Koch Brewery ("The Tiny Little Brewery Where Real Beer Is Made") remains in the whole area, and it is the nation's second smallest brewer, holding only five-tenths of 1 percent of the American beer market. The smallest producer is San Francisco's unique Anchor Steam Beer. Mr. Kalmanovitz testified that at the time of trial one of his breweries was the only independent brewer left in the State of California.

The result of all these changes in the industry has been to compel the smaller brewers to combine in order to produce beer at near capacity levels in one brewery, rather than at a fraction of capacity in several inefficient breweries. Also, as Robert T. Colson, Executive Vice-President of Falstaff testified, "the brewing industry in the late '60's and early '70's was a hotbed of price promotions," (Plaintiff's Ex. 115, at p. 114), as brewers scrambled for a piece of the declining market share held by regionals, and cut prices to do so.

## Ballantine and Falstaff

For the first half-century of its existence, P. Ballantine & Sons was a family owned operation, producing generally for the northeast market. In the early 1970's, the "tristate" area of New York, New Jersey, Connecticut and Pennsylvania accounted for approximately half of its sales. Its principal products were Ballantine Beer, Ballantine Ale, Ballantine India Pale Ale and Munich Beer. Ballantine Beer is primarily a "price" beer, the term used in the brewing industry to distinguish low-priced beers from middle-range or high-priced "premium" beers. The distinction is based on price and "image" rather than on any inherent difference in quality. Ballantine's sales declined from 1961 on, and the company lost money from 1965 on.

On June 1, 1969, Investors Funding Corporation, a New York based real estate conglomerate having no prior experience in the brewing industry, acquired substantially all of the capital stock of Ballantine for $16,290,000.00.[6] In the first two years of its ownership, IFC increased advertising expenditures significantly, levelling off its advertising budget in 1971 at approximately $1 Million a year. Although its period of ownership coincided with the entry of the nationals into the northeast market, the largest beer consumption area in the country, IFC managed to increase its sales of Ballantine products during each month it held the company. Despite this apparent "success," Ballantine never turned a profit for IFC, and during the first three months of 1972, immediately before Falstaff's acquisition of the company, was losing approximately $1 Million a month. During the whole period 1969–1972, the Ballantine Brewery in Newark, New Jersey was pro-

nationals could serve competitively. They can now supply vast areas of the country from centralized breweries without having to concern themselves with the cost of return transportation of empty bottles.

6. Mr. Donald Orenstein was Executive Vice-President of Investors Funding Corporation and of P. Ballantine & Sons at the time the negotiations with Falstaff took place. He testified at trial to the IFC management's complete lack of experience in the brewing industry. His own career began with IFC as a clerk, and ultimately he became President of IFC Realty Service. He stated at trial his views on IFC's acquisition of Ballantine (Tr. p. 124):

"Q. When did it become apparent to you that Investors Funding should sell P. Ballantine & Company?

A. The second day that I arrived at P. Ballantine, in '69. He [Mr. Jerome Dansker, Chairman of the Board of IFC] bought it on a Thursday; I told him Friday to sell it."

For further details concerning the activities of IFC and its management, see *United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976).

ducing at only about 50% of its five-million barrel capacity.

IFC used two methods to distribute the Ballantine products. The first was the normal method in the industry, sales at wholesale to independent distributors. Ballantine also, however, sold beer directly to smaller accounts ("Mom and Pop stores," bars, and the like), using its own warehouses and trucks. In the New York area this "retail" operation in 1972 was servicing some 25,000 accounts directly from the Ballantine brewery in Newark, New Jersey.

In the early 1960's, Falstaff Brewing Company was the nation's fourth largest brewer, although its distribution was primarily in the West and Midwest. In 1964 it embarked upon a ten year program to enter the ranks of the "national" brewers. As part of this expansion, Falstaff in 1965 acquired the Narragansett Brewing Company, at the time the largest producer of beer in New England. See, *United States v. Falstaff,* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) and 383 F.Supp. 1020 (D.R.I. 1974).

By contract dated March 3, 1972, Falstaff acquired Ballantine's assets. The closing took place on March 31, 1972. At that time Falstaff was the fifth ranking brewer in the United States but had failed to acquire a substantial foothold in New York, New Jersey and Pennsylvania, the highest beer consuming region in the country. Its purchase of Ballantine was apparently prompted by the desire to acquire a ready-made distribution system in the New York area, and by its need to utilize the excess capacity of its own breweries. Falstaff did not buy the Ballantine brewery in Newark, New Jersey. At some undetermined date during its ownership of Ballantine, Falstaff began using its own beer, without formula alteration, to fill Ballantine Beer containers. At the present time, the only difference between Ballantine and Falstaff Beer is the label. Falstaff was also motivated in its purchase by the fact that Ballantine Beer was (and is) a "price" beer in the Northeast and would in the normal course of events not compete with Falstaff's own so-called "premium" beer.

Shortly after acquiring the Ballantine assets, Falstaff moved the "retail" distribution operation from Newark, New Jersey (the location of the Ballantine brewery) to North Bergen, New Jersey, where it continued until 1975 to service generally the same accounts. Between 1972 and 1975, Falstaff also continued the former policy of substantial advertising of Ballantine products, spending more than $1 Million a year for that purpose. Falstaff continued in every way the former pricing policies used by IFC, including substantial "post-offs" from listed prices. During this period, Falstaff claims to have lost $22 Million in its Ballantine brands operations.

A very significant change in the *modus operandi* of Falstaff-Ballantine took place in 1975. In March of that year, Mr. Paul Kalmanovitz, an entrepreneur with 40 years experience in the brewing industry who had owned a small position in Falstaff stock prior to that time, advanced $3 Million to Falstaff to enable it to meet its payroll and other pressing debts then due. On March 10, 1975, in return for some $10 Million cash advanced, and additional loan guaranties, Mr. Kalmanovitz was issued new convertible preferred shares in amounts equal to about 35% of the company's outstanding shares. A voting trust arrangement was made to give him control of the Board of Directors. The shareholders of Falstaff approved the agreement on April 28, 1975. At present, Mr. Kalmanovitz is Chairman of the Board of Falstaff.

Mr. Kalmanovitz is a highly individualistic entrepreneur in the highest tradition of the old school. He has built and owned several television studios, including the first ABC studio in California, and owns several advertising agencies. His experience in the brewing industry began in 1935, when he began to purchase the 27 nightclubs and restaurants he eventually came to own in California. His acquisition of breweries began in 1950, and at different times he has bought 17 of them, including Regal Pale Brewing Company, Maier Brewing Company, Walter Brewing Company, Grace Brew-

ing Company, Goebel Brewing Company and General Brewing Company (the California producer of Lucky Lager Beer). In January 1978, he acquired the Pearl Brewing Company of San Antonio, Texas.

Although he is now 72 years old, Mr. Kalmanovitz testified convincingly to his drive to keep active and specifically to his desire to attempt to set aside what he called "the Coors' timetable" (Tr. p. 699). This is a reference to the estimate of Mr. William K. Coors, President of Coors Brewing Company, that by 1980 there would be only five brewers left in the United States. Mr. Kalmanovitz's philosophy in attempting this task is simple:

"So I have a firm opinion that profit is not a dirty word. Profit is a better product at lower cost to the consumer, and [is] employment . . . ." (Tr. p. 667). The message conveyed to his distributors is equally simple:

" 'Just buy our product and sell it and make a profit.' That's my philosophy. It has been successful because I am still here as an independent brewery." (Tr. pp. 670–71).

Since Mr. Kalmanovitz's assumption of control of Falstaff the advertising budget for Ballantine products has decreased from about $1 Million a year to a point near non-existence (about $115,000.00 since the beginning of 1976). Substantial cuts have also been made in sales and management personnel. In late 1975 four of the six "retail" distribution centers, including the North Bergen depot, were substantially closed or phased out. The North Bergen depot was replaced by two independent distributors who together service substantially fewer accounts. In mid-1976 Mr. Kalmanovitz also discontinued the price cutting policies of former management, ordering that no beer was to be "given away" in the future.

Concomitant with these changes, and, plaintiff argues, causally related to them, there has been a precipitous decline in the sales of Ballantine products, and a slightly less precipitous diminution in the sale of Falstaff products. In December 1975, Falstaff unilaterally discontinued royalty payments on sales of Ballantine products.

After selling its brewery assets in March 1972, Balco Properties Corporation attempted to convert the Newark Industrial and Office Plaza, the site of the brewery, into an industrial park. Financially, the attempt was unsuccessful, and in October 1974 both Balco and its parent corporation, IFC, filed petitions for voluntary reorganization under Chapter X of the bankruptcy laws. See, Memorandum Opinion of Judge Bonsal of this Court, dated December 21, 1977, *In the Matter of Investors Funding Corporation of New York, Balco Properties Corporation,* Dkt. No. 74 B 1454, familiarity with which is assumed.

*Plaintiff's Claims Pleaded*

Plaintiff is suing to recover money damages for Falstaff's breach of contract in three separate instances: (1) Falstaff's "substantial discontinuance" of distribution of Ballantine products, or its failure to use best efforts to keep sales of them high; (2) Falstaff's underpayment of royalties prior to December 1975; and (3) Falstaff's discontinuance of royalty payments on Ballantine products sold after December 1975. We consider these claims separately.

After the trial of this action, plaintiff abandoned all claims for substantial discontinuance and lack of best efforts for the period before May 1975 (the date Mr. Kalmanovitz assumed operating control of Falstaff).

The relevant portions of the contract on which plaintiff relies are as follows:

"8. *Certain Other Covenants of Buyer.* (a) After the Closing Date the [Buyer] will use its best efforts to promote and maintain a high volume of sales under the Proprietary Rights."

"2(a)(v) [The Buyer will pay a royalty of $.50 per barrel for a period of 6 years], provided, however that if during the Royalty Period the Buyer substantially discontinues the distribution of beer under the brand name 'Ballantine' (except as the result of a restraining order in effect

for 30 days issued by a court of competent jurisdiction at the request of a governmental authority), it will pay to the Seller a cash sum equal to the years and fraction thereof remaining in the Royalty Period times $1,100,000, payable in equal monthly installments on the first day of each month commencing with the first month following the month in which such discontinuation occurs . . . ."

I find that plaintiff has failed to prove "substantial discontinuance" under the contract. In interpreting a contract, " '[t]hat interpretation is favored which will make every part of a contract effective.' " *National Equipment Rental, Ltd. v. Reagin,* 338 F.2d 759, 762–63 (2d Cir. 1964), quoting *Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 347, 126 N.E.2d 271 (1955). In this instance, any interpretation of the contract which would apply the substantial discontinuance clause to the facts proved on the trial would render nugatory the "best efforts" clause of the same contract. Falstaff now and at all times has distributed beer under the Ballantine name to all who would purchase it at a price above Falstaff's costs. Whether the totality of its merchandising efforts complies with the obligation to use "best efforts" presents a more difficult question.

Plaintiff apparently attempts to distinguish the two clauses on the ground that the "substantial discontinuance" clause looks to the *distribution* of beer rather than to its *sale,* and argues that the closing of the North Bergen "retail" distribution center and other similar actions constitutes such discontinuance. This, however, is a distinction without a significant difference, and stands opposed to the fact that Falstaff, during its control of Ballantine, increased the number of distributors carrying Ballantine labels from 106 to 644, and has to some extent introduced Ballantine in its own national markets. The amount of sales must be considered in determining substantiality. If this is done, Ballantine's claim fails, even under its proposed construction of the substantial discontinuance clause. Total Ballantine sales in 1975 amounted to

974,774 barrels; in 1976 they declined to 582,964 barrels; and in 1977 to 518,899 barrels. A very significant part of this decline is attributable, as we shall discuss below, to the general decline of the market share of the smaller brewers, and to other causes unconnected with Falstaff's closing of the North Bergen facility. The remaining decline is regarded as "insubstantial" under the contract. It is clear from the royalty rate established in the contract itself that the liquidated damages clause was included to cover situations approaching the *total* cessation of Ballantine production, rather than situations involving gradual but significant declines in sales.

Ballantine has, however, proved its claim that Falstaff failed to use its best efforts to promote sales of Ballantine products after May 1975.

The parties differ with respect to the meaning and effect of "best efforts". Defendant has urged on the Court the argument that the interpretation of such a clause requires the application of a subjective standard: Falstaff contracted to use *"its"* best efforts, and any determination of those efforts must include considerations of Falstaff's own allegedly precarious financial position. Plaintiff, on the contrary, cites substantial precedent holding that financial difficulty and economic hardship do not excuse performance of a contract, and argues for the application of an objective standard, that of the "average, prudent comparable" brewer. *Arnold Productions, Inc. v. Favorite Films Corp.,* 176 F.Supp. 862, 866 (S.D.N.Y.1959), aff'd., 298 F.2d 540 (2d Cir. 1962).

The point of the argument appears to be defendant's contention that it promoted Ballantine to the full extent that its own straitened financial abilities permitted, and could do no more.

"Best efforts" is a term "which necessarily takes its meaning from the circumstances." *Perma Research & Development v. Singer Co.,* 308 F.Supp. 743, 748 (S.D.N.Y.1970). In a patent assignment case, for example, in which the court found an implied obligation to use "best efforts," Judge

Duffy examined the assignee's research capability and net earnings, and stated: "To properly evaluate Singer's performance under the patent assignment it is necessary to look first at Singer's capability." *Id.,* 402 F.Supp. 881, 890 (S.D.N.Y.1975), *aff'd.,* 542 F.2d 111 (2d Cir.), *cert. denied,* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976). "Capability," however, is a far broader term than "financial ability." It includes the marketing expertise and experience attributable to the "average, prudent, comparable" brewer. It is obvious that any determination of the best efforts achievable by Falstaff must take into account Falstaff's abilities and the opportunities which it created or faced; Falstaff did not contract to promote Ballantine at the level or to the degree that Anheuser-Busch or Schlitz might have done. It did, however, contract to merchandise Ballantine products in good faith and to the extent of its own total capabilities, and this it failed to do.

██ The evidence in the case also shows that Falstaff's financial position during most of the period in litigation was far from that depicted by defendant, and that Falstaff failed to use even its own temporarily circumscribed abilities and resources to promote the sale of Ballantine products.[7]

The record shows that when Mr. Kalmanovitz assumed operating control of Falstaff, the company was faced with serious cash-flow difficulties and could not meet its immediate (March 1975) payroll. The record also shows, however, that the company had considerable borrowing capacity. Indeed, it did borrow successfully from Mr. Kalmanovitz. Also, by 1976 Falstaff's financial picture was much improved: the net income of Falstaff in 1976 was $8.7 Million; its working capital in that year was $20.2 Million, up from $8.6 Million in

1975, and its cash and certificates of deposits in 1976 stood at $12.1 Million, up from $2.1 Million in 1975. This upward trend has continued, and even improved in 1977. (Falstaff Annual Reports for 1975 and 1976, Exhibits 43 and 44). More significantly, in late 1975 Falstaff ignored an opportunity to promote distribution of Ballantine products in the New York City area that would have cost it nothing to exploit and that was well within its "capabilities." After August 1975, Falstaff closed four of its six "retail" distribution centers, including the North Bergen, New Jersey center, which accounted for a very significant percentage of all Ballantine sales. Its reason for taking this drastic action was the losses these operations were allegedly experiencing; the North Bergen facility alone was apparently losing about $2.2 Million annually in distributing Falstaff and Ballantine products.

No studies were made on the effect such closings would have on Ballantine sales, and the only alternative explored was to continue the North Bergen depot on an enormously reduced basis. Albert C. Hoffmeister, a Falstaff Vice-President, testified that the result of the closing and consequent failure to service the "Mom and Pop stores" was "disastrous." (Plaintiff's Ex. 127.) Mr. Joseph E. Griesedieck, Jr., President of Falstaff, testified that Falstaff was prepared to lose the entire New York-New Jersey metropolitan area for both Falstaff and Ballantine. (Plaintiff's Ex. 67, p. 74). He also testified that Falstaff was aware that if it cut off its small accounts from deliveries it would lose them completely. (*Id.* at p. 99.) Finally, he stated that the company, in making its decision, did not consider the possibility of continuing distribution through distributors (Ex. 67, pp. 99–101):

"Q. So, am I given to understand from your responses strictly, is it not true

---

**7.** Even if Falstaff's financial position had been worse in mid-1975 than it actually was, and even if Falstaff had continued in that state of impecuniosity during the term of the contract, performance of the contract is not excused where the difficulty of performance arises from financial difficulty or economic hardship. As the New York Court of Appeals stated in *407 E. 61st St. Garage, Inc. v. Savoy Corp.,* 23 N.Y.2d

275, 281, 296 N.Y.S.2d 338, 344, 244 N.E.2d 37, 41 (1968):

"[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." (Citations omitted.)

that what the company was doing was expecting that in order to stay in the market it would have to operate through distributors?

A. No. We expected to stay in the market on a much reduced basis through the operation of fewer trucks out of North Bergen.

Q. What you kept in North Bergen after October pursuant to your instructions to Mr. Panichas was a total of 10 routes?

A. That's right.

Q. One in New York instead of 33?

A. That's right.

Q. In essence, to a large degree at least 99 percent you are going out of business in the metropolitan New York area?

A. That's right.

Q. With no expectations of getting [back] those customers of your product; is that right?

A. Getting them how?

Q. How would you be intending to continue to market in New York with one route?

A. I already told you. On a reduced basis . . . . We indicated that cutback substantially so that we would run one route. That does not remove us from the market. It may make us a minor factor, but it does not remove us from the market."

As a consequence of this precipitous departure from the New York City market area, Ballantine registered no sales there for the month of September 1975. In October and November 1975, Falstaff, on the initiative of several independent distributors, selected Thomas Fatato, Inc. to distribute Ballantine products in New York, and L. A. Piccirrillo, Inc. to distribute them in New Jersey. The performance of these two has been less than impressive, and, indeed, at the time of their appointment, strong concern about their ability to cover the metropolitan area adequately was expressed by Mr. Griesedieck, President of Falstaff (Plaintiff's Ex. 149, p. 44). Fatato,

for example, services only about 1,500 to 2,000 of the approximately 15,000 to 17,000 retail accounts formerly serviced from North Bergen. In the first month of his operation (October 1975), sales dropped to 2,500 barrels from some 7,000 barrels sold in August. There was convincing testimony from defendant's own employees that Mr. Fatato's ownership of a competing brand, Milwaukee Beer, on which he earns both the distributor's and manufacturer's profit would naturally result in his giving preference to his own brand in the competition for shelf-space, rather than aggressively marketing Ballantine. Since Fatato has been distributing Ballantine in the New York City area, sales of Ballantine draught beer have declined more than 90 percent. Despite all this, Mr. Kalmanovitz testified that Fatato's performance as a distributor was better than expected. (Plaintiff's Ex. 123, p. 178.)

Under its union contract with its employees at the North Bergen depot, Falstaff considered itself legally bound not to appoint an official distributor for the tristate area to whom Falstaff would make shipments from its brewery in Cranston, Rhode Island. Both Fatato and Piccirrillo bought Ballantine Beer in Rhode Island and transported it themselves into the New York City area. This union contract would have expired in May 1976, but Falstaff's failure to terminate it with proper notice resulted in an arbitration award extending the contract until May 1977. (Defendant's Ex. 212.) Falstaff urges the existence of this contract as the excuse for its failure to take advantage of a very significant opportunity in the fall of 1975 which would have cost it nothing to exploit, but Ballantine may not be charged with Falstaff's negligence in failing to terminate its labor contracts properly.

In September or October 1975, Mr. John Molyneux, Vice-President and General Manager of the Guinness-Harp Corporation, an importer of foreign beers, and distributor of various American brands including Schlitz, Schmidt's, Pabst and Piels, journeyed to San Francisco to discuss with Mr.

Kalmanovitz the possibility of undertaking the distribution of Ballantine products. Mr. Molyneux testified that his company would be able to handle all of the Ballantine products (except Munich Beer) at the prices quoted by Mr. Kalmanovitz and would be able to distribute them profitably through the Metrobeer Division of Guinness-Harp, to about 13,000 of the 15,000 retail licensees in New York City.

Mr. Molyneux was willing to go ahead with the planned distributorship. A letter from Falstaff dated October 16, 1975 (Plaintiff's Ex. 72) informed him that Mr. Fatato had undertaken some distribution activities in the New York area, but still held open the possibility that Guinness-Harp might purchase beer from the Rhode Island brewery and transport it to New York in its own trucks. On October 20, 1975, however, Falstaff wrote to Mr. Molyneux that even that offer was withdrawn because Falstaff wanted to give Mr. Fatato a chance in New York and did not want to "invite competition" by other wholesale operations.

I find that Guinness-Harp presented Falstaff with an opportunity to promote Ballantine products that an "average, prudent, comparable brewer" situated as was Falstaff reasonably would and should have explored and sought to exploit. Existence of the union contract was not an obstacle to such an arrangement. There is no credible evidence that Mr. Molyneux demanded an exclusive "appointment" in the New York City area. In any event, after May 1976, any inability to appoint such an exclusive distributor in the New York area was caused by the fault or negligence of Falstaff. To the extent such fault or negligence prevented it from using effective marketing methods in the area which Molyneux proposed to serve, it is answerable in damages to Ballantine.

Defendant argues that it had the right, and even the duty to use in good faith its best business judgment in all matters arising under the contract, and also had the right to look to its own interest. This argument has some validity, but Falstaff has

gone beyond that point. As the New York Court of Appeals said in a similar situation:

"Although a publisher has a general right to act on its own interests in a way that may incidentally lessen an author's royalties, there may be a point where that activity is so manifestly harmful to the author, and must have been seen by the publisher so to be harmful, as to justify the court in saying there was a breach of the covenant to promote the author's works." *Van Valkenburgh v. Hayden Publishing Co.*, 30 N.Y.2d 34, 46, 330 N.Y. S.2d 329, 334, 281 N.E.2d 142, 145 (1972).

Mr. Kalmanovitz as a traditional businessman expressed at trial his contempt for "studies" and "projections." Consequently, in making the decisions to close the North Bergen facility and to appoint Mr. Fatato distributor in the New York City area, no effort was made to ascertain in advance the effect on Ballantine sales. Mr. Kalmanovitz did not even consult Falstaff's regional manager, Albert Hoffmeister. Coupled with this is Falstaff's expressed willingness to see the whole New York-New Jersey area lost for Ballantine (Tr. p. 469), and its expectation of that result (Plaintiff's Exhibit 125, p. 21). Falstaff was willing to appoint a distributor for the area, Mr. Fatato, about whose abilities the President of Falstaff had serious reservations, and to continue him in a virtual monopoly of Falstaff products in the area despite Mr. Molyneux's proposals. These actions exceed any reasonable variance allowable in the exercise of sound business judgment. No effort was made by Falstaff to examine or find alternatives to the drastic step of closing the North Bergen facility, although it accounted for a very large percentage of Ballantine sales.

Some of this apparent callousness towards Ballantine sales is undoubtedly caused by the fact that even though the liquid in a can of Ballantine Beer and in a can of Falstaff Beer is identical, and accordingly costs exactly the same amount to produce, sale of Falstaff Beer produces a greater profit for Falstaff. In part this is the result of the fact that Falstaff is a

"premium" beer and nets Falstaff about $4.20 more a barrel than does Ballantine, even before the $.50 Ballantine royalty is subtracted from the latter. Also, Mr. Kalmanovitz testified, the process of changing a production line over from Falstaff to Ballantine Beer "cost[s] a lot of money." (Plaintiff's Ex. 123, p. 16.)

In addition to Falstaff's refusal to entertain Mr. Molyneux's proposals despite the apparent inadequacy of the Fatato-Piccirillo distributorships, Falstaff has also failed in several other notable respects to promote Ballantine products with its best efforts. After Mr. Kalmanovitz's assumption of control of Falstaff, the company severely cut back personnel in distribution, sales, marketing, administrative and warehousing areas. It virtually eliminated its promotion and advertising of Ballantine Beer and closed its advertising department, all this despite the repeated assertions by experts for both sides (for example, Mr. Weinstein for plaintiff and Mr. Dependahl, former Vice-President of Falstaff, for defendant) that personal contact, merchandising and advertising were essential to the marketing of any beer. While some cutbacks may have been temporarily justified in late 1975, the situation was quite different in 1976 and 1977 when Falstaff continued its stated policy of simply making the beer available, and when solicited by distributors, funding one-half of "co-op" promotional costs. After Mr. Kalmanovitz assumed control of Falstaff, the company even discontinued the establishing of goals for its remaining salesmen, an essential step in any marketing effort, and one which would have cost the company nothing to implement (Plaintiff's Ex. 129). This is not "best efforts." Mr. Charles W. Dependahl, Jr., a Falstaff Vice-President, gave the following testimony (Plaintiff's Ex. 126, p. 368):

"Q. If the Falstaff Brewing Corporation, subsequent to May 1, 1975, informed distributors that Falstaff brews the beer and makes it available, [and that] it is the distributor's obligation to distribute, advertise, promote, market, have sales contact, merchandise the beer, and not Falstaff's obligation, would that, in your opinion, be consistent with Falstaff's obligation to use best efforts to promote and maintain a high volume of sales of the Ballantine brand?

A. Counselor, in my opinion that is not the way to sell beer."

Falstaff's marketing policies after May 1975 are well summed up in the words of Mr. Kalmanovitz (Plaintiff's Ex. 109, p. 194):

"We sell beer and you pay for it . . . We sell beer, F.O.B. the brewery. You come and get it.

Our responsibility is to give good product and you got responsibility to pay for it. That's it. That's the substance of my arrangement. Its working."

Mr. Molyneux of the Guinness-Harp corporation confirmed that Mr. Kalmanovitz's policy was simply to make the beer available. "It was made quite clear to me that all Falstaff would do would be to sell me the beer and from there on out, we were on our own." (Tr. p. 194.)

Falstaff also, of course, has continued the policy of "co-op" promotion, by which it pays 50% of promotional or advertising costs incurred by a distributor who desires to engage in such activities. The amount of such expenditures, however, is minimal; they are done only at the instigation of the distributor; and, finally, they lack the coordination which several experts testified was necessary to successful advertising.

Defendant has stressed the argument that Falstaff's policies after 1975 were evenhanded, that is, that Falstaff's cutbacks and marketing strategy affected Falstaff and Ballantine performance equally. Even if this were the case, which it is not, Falstaff's relationship to Ballantine is essentially different from its relationship to its own products. In the latter case, it may promote, continue or discontinue its products as it wills, subject to its duty to shareholders; in the former case it is bound by a contractual duty to the promisee. As the court said in a case cited by the defendant here:

" '[B]est energies' meant such effort as in the exercise of sound judgment would be likely to produce the most profitable results to the promisee in view of the nature of the business and the extent of the territory over which it was to be conducted." *Randall v. Peerless Motor Car Co.,* 212 Mass. 352, 374, 99 N.E. 221, 226 (1912).

Additionally, Falstaff has not treated both products equally. Robert Thibaut, a Falstaff Vice-President, testified that Falstaff but not Ballantine had been advertised extensively in Texas and Missouri (Plaintiff's Exhibits 131, p. 31 and 132). In the same areas Falstaff, although a "premium" beer, was sold for extended periods below the price of Ballantine. These actions and failures to act were not consistent with those of the average, prudent, comparable brewer in the same circumstances seeking to promote a beer to the extent of his best efforts. The "business judgment" argument is of no help to Falstaff in this regard.

Defendant makes much of facts that during its ownership of Ballantine it has increased by a factor of five the number of distributors handling Ballantine products (from 106 to 644), and that it has introduced Ballantine into foreign markets, especially Nigeria. Both of these facts are true, but their importance is diminished by the fact that sales of Ballantine products on which royalties are due have declined in inverse proportion to the gross number of distributors used to make the sales. Also, in the case of Nigeria, Ballantine products were sought out by the foreign purchaser by name. Finally, defendant contends, that whatever its failure with regard to best efforts, plaintiff is unable to prove damages in this case since the total decline in Ballantine sales is directly attributable to market factors affecting the small brewers generally and to Falstaff's justifiable elimination of Ballantine's illegal marketing practices. The first point will be discussed in greater detail in considering damages specifically, but the second requires some mention here.

Counsel for both parties agree that there was *some* illegal activity taking place before 1976 in connection with marketing both Ballantine and Falstaff beer.[8] Although witnesses were understandably reluctant to testify to their own personal participation in such acts and records were apparently lost or destroyed, these practices appear in general to have been as follows. The great majority of brewers in the late 1960's and early 1970's engaged in "retention" and "solicitation." Both of these are terms of art in the jargon of the beer industry. "Retention" apparently consisted in a salesman's call at a tavern already supplying Ballantine or Falstaff products, in which the salesman would ask the customers and publican to "try a glass of Ballantine (or Falstaff)." He would pay for this in cash. The cost of "retention" for Ballantine was approximately $4.00 to $5.00 a month per salesman for each account.

In "solicitation," the salesman would enter a tavern that sold no Ballantine products, or only part of the line and would buy a round for the house, of whatever each customer was already drinking. Once bonhomie had been established, the salesman

---

**8.** At trial the parties assumed the illegality of certain sales practices engaged in by the brewing industry generally and by Ballantine and Falstaff specifically. Understandably the nature of the illegality involved was not made too clear. However, Defendant's Exhibit 204, the Reports of Special Counsel and Special Auditors for Emersons, Ltd., details the investigations of the Securities and Exchange Commission and the Bureau of Alcohol, Tobacco and Firearms into the dealings between persons acting for the Emerson's restaurant chain and Falstaff and the Joseph Schlitz Brewing Company. The authors considered payments made in cash to Emerson's and certain of its employees in order to facilitate sales to be "questionable" under (1) The Alcohol Administration Act, 27 U.S.C. § 201, *et seq.* (prohibiting commercial bribery and special considerations in the sale of alcoholic beverages); (2) the Clayton and Robinson-Patman Acts, 15 U.S.C. §§ 13 and 13(a) (prohibiting price discrimination between similarly situated customers); and (3) "a host of local laws" prohibiting commercial bribery and regulating the sale of alcoholic beverages. This practice was referred to at trial as "black bagging," on the assumption that a black briefcase is as usual to commercial bribery as a brown paper bag is usual to illegal narcotics transactions.

would "talk up" the virtues of his product. The cost of a solicitation call amounted from $20.00 to $30.00.[9]

Besides this form of promotion, Ballantine also engaged in "black bagging," an activity never satisfactorily explained at the trial, but which apparently consisted in rebates, either in the form of cash, or "promotional" credits, or delivery of more product than invoiced, done for certain large "national" accounts, such as the restaurant chains known as "Lums," and "Steak and Brew," and "Emerson's," which purchased large quantities of draught beer from Ballantine. Connected with "black bagging" was defendant's charge that Ballantine, especially in the New York City and Florida areas, was essentially giving away its product to stimulate sales, allowing distributors promotional "post-offs" from officially listed prices of such magnitude that the beer was distributed below cost.

No credible evidence supports this last charge. Defendant's own witness, Thomas B. Redmond, Falstaff's Marketing Manager for the Great Lakes Region and a former Ballantine salesman in Florida, testified that all Ballantine price promotions in Florida during IFC's period of ownership were strictly legal (Tr. p. 602). This is supported for all of Ballantine's markets by the testimony of J. Conway, Financial Vice-President of P. Ballantine & Sons in 1972, that Ballantine products were never sold below manufacturing cost. (Plaintiff's Ex. 120.)

The existence of other forms of illegal activity is apparently conceded by the parties. Its scope and effect, however, is in dispute. Defendant argues that the precipitous decline in Ballantine sales is a direct result of the action of Mr. Kalmanovitz in May 1976 in prohibiting *all* illegal or arguably illegal sales promotion or post-offs in the promotion of Ballantine and Falstaff products. *See* Defendant's Exhibits 91 and 212. There has been no competent showing of causal connection between certain sales and illegal activities. Falstaff's own Great Lakes Marketing Manager testified to the major factors influencing sales in Ballantine's principal market (New York) without thinking it necessary to include "black bagging" as a factor.

The correct scope of the effect produced by the elimination of such illegal activities is best indicated in the testimony of Albert Hoffmeister, Falstaff Vice-President, concerning a study commissioned by him in 1973 on the effect termination of "illegal" allowances would have on sales in the New England region.[10] The study indicated that such elimination would result in a decline in sales of from 5% to 5.5%, a figure which will be taken into consideration in computing plaintiff's damages. Falstaff's agreement to use best efforts did not require it to engage in illegal activity to promote the sale of Ballantine products, or to continue prior improper conduct.

Accordingly, I find that from September 1975 until the present, Falstaff has breached the covenant in its agreement with plaintiff's predecessor, in that it failed without justification to use its best efforts to promote the sale of Ballantine products and has neglected to act in the manner required of the average, prudent, comparable brewer in marketing his product.

### Defendant's Counterclaims

*Cooperage.* Pursuant to the contract of sale between Ballantine and Falstaff dated March 3, 1972, Ballantine agreed "to sell, convey, assign, transfer and deliver to the Buyer on the closing date", "all right, title and interest of the Seller in and to . . . cooperage in hand or in the trade and related component parts listed or generally described in Exhibit C here-

9. Mr. Thomas B. Redmond, Marketing Manager for Falstaff's Great Lakes Region and a former salesman, testified movingly to the problem faced by salesmen in avoiding a "snootfull" when making eight to ten of these solicitation and retention calls a day. Tr. at 598.

10. Falstaff's New England Region included the states of Connecticut, Massachusetts, Vermont, New Hampshire, Maine and Rhode Island.

to . . . ." (Plaintiff's Exhibit 1, ¶ 1(c), p. 3.) Exhibit C listed under the heading "Draught Containers Owned 3/1/72" a total of 121,085 items of cooperage, consisting in 517 barrels, 106,646 half barrels, and 13,922 quarter barrels. The price of cooperage appears to be about $22.00 per half barrel. According to Falstaff's fragmentary files on cooperage returns, Falstaff had by the end of 1974 accounted for only 101,916 pieces of Ballantine cooperage.

Falstaff argues that under the contract Ballantine was required to "deliver" the requisite number of items of cooperage and has failed to do so. This interpretation of the contract is rebutted by Falstaff's own actions under the contract and by its trial memoranda which repeatedly state that "[a]t the time of the acquisition a large percentage of the cooperage was in the possession of Ballantine distributors. For that reason Falstaff expected some delay prior to receipt." (Defendant's Trial Memorandum in Support of Counterclaims, p. 9.) It is clear that the intent of the contract was simply that Ballantine would sell to Falstaff all of its interest in what its records showed to be 121,085 pieces of cooperage, and that these would, in the normal course of business be returned piecemeal by the distributors to Falstaff.

Defendant has failed to prove its claim. Not only are its records incomplete, but more importantly, the defendant's own actions played a major role in preventing the return of cooperage. Ballantine policy before Falstaff's acquisition of the company in 1972 was to pay the freight on all returned cooperage. Falstaff was aware of this policy from the beginning, but almost immediately instituted its own policy that the distributors pay freight on returned cooperage, even on cooperage already in their hands at the time the new policy took effect. See, e. g., Tr. p. 410–411. The defendant has provided the Court with no method by which the results of its own acts can be distinguished from those attributable to Ballantine. It was easier and more profitable to the distributors to sell these aluminum barrels to scrap metal dealers or allow them to be stolen, than to lay out cash freight to return them. The business relationship with its distributors, most of which also handle other competing brands, was such that it could not compel diligent attention to the return of empty barrels (cooperage).

*Corn Grits.* On the eve of trial Falstaff for the first time in this case asserted a claim that some 170,000 pounds of corn grits purchased from Ballantine were unusable because of infestation and moldiness. Under the contract, Ballantine warranted that this inventory was "usable or marketable by the Seller in accordance with its customary standards." (Plaintiff's Ex. 1, ¶ 9(f), p. 17.)

Defendant has failed in all respects to prove its case with respect to this counterclaim. Its documentation in support of the claim includes a Ballantine invoice dated March 30, 1972 showing an inventory at Ballantine's Newark brewery of some 2.1 million pounds of corn grits, and reciting a shipment of undetermined weight on that date in four freight cars, numbered here "A" to "D" for convenience. (Defendant's Ex. 145.) Defendant's Exhibit 147, dated October 10, 1973 is a Falstaff inter-office Memorandum stating that freight car "C" with some 93,000 pounds of grits had been received by Falstaff on April 20, 1972 and rejected by a "Quality Control—Material Rejection Notice" dated April 28, 1972. That document (p. 2 of Exhibit 147), after the words "Ballantine Brewery, Newark, N.J.," lists seven freight cars (including "C" and "D") as having been rejected because of contamination. The document also states "Information on supplier not applicable," and indicates that the seven carloads were sold to a salvager. No explanation is given to explain the presence of the other five carloads of grits not in the Ballantine invoice. The final page of Exhibit 147 is a computer printout showing the sale of 11 carloads of grits amounting to 1.7 million pounds to a salvager. The list includes cars "A" to "D". No indication is given of the amount received for salvage.

274

In its post-trial memorandum, defendant compounds the confusion by arguing that the 11 carloads sold consist of the seven cars (including "C" and "D") referred to in the Material Rejection Notice and the four cars (including "A" to "D") mentioned by the Ballantine invoice. Finally, by a letter dated November 29, 1972, Mr. Arnold Potash, General Counsel to Falstaff, Ballantine was advised that "[w]e have checked with our personnel and they have assured us that as of March 31, 1972 [the closing date] the corn grits were in a 'useable and marketable' condition." (Plaintiff's Ex. 79.)

■ Of course, proof of the amount received for salvage would be an essential part of defendant's proof of damages. On the entire record, defendant has failed to prove liability or damage with respect to the corn grits.

■ *The Pflaumer Account.* By the terms of the March 3, 1972 contract, Falstaff agreed to purchase "all right, title and interest of the Seller in and to each retail account receivable of the Seller and each account receivable of the Seller confirmed in writing to either party hereto prior to May 1, 1972 . . . ." (Plaintiff's Ex. 1, ¶ 1(f), p. 4.) For these accounts Falstaff agreed to pay Ballantine 75% of face value immediately, and an additional 75% of all monies collected by Falstaff in excess of 75% of face value.

As of the closing date, William H. Pflaumer, Inc. ("Pflaumer"), a Pennsylvania distributor for Ballantine, had confirmed that it owed a total of $831,505.45 for beer shipped to its distributorship. The parties agree that it is unlawful under Pa.Stat. Ann., tit. 47 § 4–493(2) for beer to be sold in Pennsylvania on credit. They also have stipulated that since the closing date Falstaff has collected in excess of $831,505.45 from Pflaumer, a figure which includes $21,769.00 in excess of amounts paid by Pflaumer for purchases of beer from Falstaff since the closing date. The state of the law in Pennsylvania was, of course, known equally to Falstaff and Ballantine at all relevant times.

Falstaff argues first that its officers in negotiating purchase of the Pflaumer account exceeded their authority. This argument is without merit. Paragraph 10(b) of the contract contains an express warranty by Falstaff's Board of Directors of Falstaff's "full power, authority and legal right under its certificate of incorporation, by-laws and the laws of the State of Delaware and Missouri to carry out the transactions to be carried out on its part hereunder." Besides this express provision, I find that Falstaff clothed its negotiators with apparent authority to act as they did. There is no contention here that Falstaff was unaware of the nature of the Pflaumer account or its illegality. Quite the contrary is true. As Mr. McClellan, Falstaff's outside counsel and a member of its Board, stated: "the Pflaumer item . . . was something that Falstaff knew fully about at the time . . . and accepted that as one of the burdens of the deal." (Plaintiff's Ex. 136, p. 70). This statement also refutes Falstaff's contention that since the Pflaumer account receivable was allegedly a void chose in action it was inadequate consideration for the promised payments. It is undisputed that the *quid pro quo* for Falstaff's purchase of the Pflaumer account was Ballantine's abandonment of its demand for a minimum royalty payment. *See* Transcript, p. 137. The chose in action was at most voidable at the instance of Pflaumer, rather than void. Pennsylvania law did not prevent Pflaumer from paying its account to Ballantine and later Falstaff if it chose to do so, nor did the law prevent Ballantine, or later Falstaff from accepting such payment. Also, no law compelled Falstaff to continue to sell Pflaumer, nor was it disabled from withholding product from Pflaumer should it welsh on its account payable. The impression is clear that sales of beer on credit to distributors at this time in violation of the statute were commonplace.

Finally, Falstaff has suffered no injury from its purchase of the Pflaumer account, since all the monies due to it have been paid. Paragraph 2(b) of the contract provides:

"For purposes of the computation of payments pursuant to [the clause regulating payments of a percentage of amounts in excess of 75% of face value], any amounts which may be paid to the Buyer by an obligor in satisfaction of any obligation distinct from the Buyer's Receivables relating to such obligor shall be treated by the Buyer as a collection of Buyer's Receivables . . . ."

Since the closing date Falstaff has received from Pflaumer monies in excess of those due under Ballantine's account receivable.

■ *The Munich Brand Name.* Under the purchase agreement, Falstaff acquired "all right, title and interest of the Seller in and to the brand names, trademarks, trade names, copyrights and other proprietary rights owned by or registered in the name of the Seller and listed and described in Exhibit A hereto (hereinafter called the "Proprietary Rights") . . . ." Exhibit A lists Ballantine's various registered trademarks, and under a separate heading, designated "Brand Names," lists the names under which Ballantine marketed its products. Included in this list is the name of "Munich" beer. A separate "Assignment of Proprietary Rights" executed by the parties contemporaneously with the contract of sale also lists Brand Names and Trademarks separately and again conveys "all the right, title and interest of the Seller" to these, "whether or not registered or registrable."

On May 28, 1976, Falstaff was sued by Verein Muenchener Brauerein, e.V., a German trade association, for certification mark infringement and unfair trade practices with respect to Falstaff's sale of Munich Beer. Falstaff suspended production of Munich Beer from July to September 1976 and as a result of that suspension sales of Munich Beer declined. The Dart Drug Store chain in Washington, D. C., which was named in the infringement suit, completely suspended sales of Munich Beer in early 1977. On March 17, 1978, pursuant to a settlement agreement between the parties, the District Court for the District of Columbia entered a permanent injunction against Falstaff which prohibits the company from marketing beer hereafter under the name "Munich."

Defendant asserts that Ballantine gave an implied warranty of the validity of the brand name Munich, and also argues that the invalidity of the name constitutes a failure of consideration. Both of these arguments must be rejected.

Falstaff's own citations to the record reveal that Ballantine never claimed ownership of brand names. During the contract negotiations Ballantine personnel merely stated that "we have these different brands that we sell under these different labels, these trade names." (McLaughlin deposition, pp. 10–11.) The brand names and trademarks included in the Proprietary Rights were closely examined by Falstaff's experienced counsel, and all information on them was made available to Falstaff. *See,* Plaintiff's Ex. 136. Ballantine merely conveyed to Falstaff all of its "right, title and interest" in the Munich brand name as those interests were revealed in Exhibit A to the contract. It did not warrant their validity beyond the specific warranties included in the contract. Finally, the Certificate of Trademark Registration for the name "Munich" was not issued to the Association of Munich Brewers until September 18, 1973, almost a year after the date of the contract.

Falstaff has not proved its claim based on the Verein Muenchener suit. It is not chargeable, however, with that part of the decline in sales attributable to that suit since it was beyond its control. This will be taken into account in computing plaintiff's damages.

■ *Ballantine's Alleged Fraud and Misrepresentation.* Falstaff's main efforts in support of its counterclaims is directed toward establishing Ballantine's fraud and misrepresentation of material facts in the negotiations leading to the signing of the purchase agreement on March 3, 1972. It specifically relies on Ballantine's undisclosed sales below cost, its artificial inflation of sales figures, and its use of illegal kickbacks and other artifices to stimulate sales.

The short answer to all these contentions is that all of the activities of Ballantine were fully revealed to Falstaff before the signing of the contract, and I so find. This is a stale claim. Falstaff had the opportunity to investigate any supposed "fraud" for more than four years after it acquired the Ballantine assets, and the fact that the claim is only made now, and made after a change in management at Falstaff, strongly indicates that the claim is without merit.

 Falstaff relies heavily on the claim that the "atmosphere surrounding the negotiations was charged with fraud." (Defendant's Trial Memorandum in Support of Counterclaims, p. 30.) The negotiations were certainly unusual. They consisted in one marathon session some 33 or 34 hours long, without even a break for meals.[11] At the time of the negotiations Falstaff was the nation's fifth-ranked brewer and had a long history of successful brewery acquisitions. It began its extensive analysis of Ballantine operations at least six months before the marathon negotiating session (Plaintiff's Ex. 9), and Ballantine employees were instructed by management to make available without exception any information requested by Falstaff (Tr. pp. 174–75). Falstaff's own executives have admitted that everything they requested from Ballantine was delivered (Plaintiff's Ex. 138, p. 24 and Ex. 115, p. 84). Specifically, Falstaff asked for and received detailed accountings of Ballantine's sales and pricing policies, including information on price allowances (Plaintiff's Exs. 12, 13, 14, 17 & 18). All promotions, credits, discounts and rebates given by Ballantine were fully reflected in the confirmations of accounts receivable provided to Falstaff.

There was considerable divergence of opinion as to what constituted a distributor's "normal" supply of beer (Defendant's Ex. 101; Tr. p. 99 and p. 409), but Mr. Orenstein testified for Ballantine to the industry practice of loading up a distributor to stimulate sales. If sales were "soft" or "inflated," and there is no showing on this record that they were, the likelihood that such practices might have occurred was fully known by Falstaff. Mr. F. J. Gutting, President of Falstaff at the time of the negotiations, testified that he suspected that Ballantine's sales were inflated and soft, and discussed that subject with Ballantine personnel in January of 1972 (Plaintiff's Ex. 116).

Falstaff has been in the brewing industry since 1933 and at the time of negotiations for the purchase of Ballantine was fully aware of "black bagging" and other similar widespread illegal promotional activities in the industry. Falstaff suspected the presence of such activities in the Ballantine operations and specifically questioned whether there were "any *unusual* blackbagging situations" at Ballantine (Plaintiff's Ex. 14, p. 2). Mr. Orenstein testified, and I find, that before the marathon negotiating session Mr. Orenstein completely revealed to Falstaff's chief operating officer, Mr. Dependahl, the details of Ballantine's then current black bagging operations, going so far as to reveal to Mr. Dependahl existence of a secret cash slush fund for those purposes not revealed or carried on Ballantine's books.[12] (Plaintiff's Ex. 144, p. 31.) Falstaff was fully aware of the nature and

---

11. This hasty manner of transacting business in a matter involving a substantial amount of money appears somewhat unusual. The haste resulted in at least two serious errors in the wording of the Purchase Agreement, but it was the manner chosen by the parties for their own purposes, and they must each accept the consequences. Mr. Orenstein, chief negotiator for Ballantine, explained the choice of "negotiation-by-endurance" by stating: "Well, I think the buyer was anxious to buy and the seller was anxious to sell." Here, both buyers' representatives and sellers' were acting as fiduciaries for their respective shareholders. They

should have conducted themselves in a more mature fashion. Had they done so, at least some of the later disputes and difficulties could have been anticipated and avoided.

12. The origin of the term "slush fund" is nautical, having no pejorative overtones. It refers to extra money raised by sailors on merchant ships through the sale of surplus cooking fats ("slush"). Its meaning and its connotation have changed as bribery has become (considerably) a more commonplace occurrence in American business.

extent of all of Ballantine's questionable promotional activities, and continued them for a period after acquiring Ballantine's assets, without even missing a step.

Falstaff has failed to prove a single representation made by Ballantine at or prior to the signing of this contract which was material to the agreement and false. No reliance on any such misrepresentation is found in the record. Furthermore, Falstaff was well informed and experienced in the industry. It was represented by skilled counsel and dealing at arms length. Any reliance on its part would not have been justifiable.

### Damages

Falstaff has breached its contract with Ballantine to use its best efforts to promote sales of Ballantine products and thus assure fair royalty payments to Ballantine. The period of this breach extends from September 1975 when Mr. Kalmanovitz's policies began to take effect, through the date of trial, and anticipatorily, through March 31, 1978, the end of the royalty period. Since December 1975, moreover, Falstaff has, as a set-off against its claims against Ballantine, withheld royalty payments admittedly due on sales of Ballantine products. In the light of our discussion of defendant's counterclaims, these set-offs were not justified. Finally, it is undisputed that royalties to Ballantine for the period from April 1, 1972 through November 30, 1975 were underpaid in the amount of $41,399.50. During that period Falstaff sold 5,108,908 barrels of Ballantine brands, for which the royalty payments should have been $2,554,454.00, rather than the $2,513,054.50, actually paid.

Damages for Breach of Contract. "In simple terms, the measure of the damage [for failure to use best efforts] is the amount necessary to put the injured party in the exact position he would have been if the contract had not been breached." *Perma Research & Development v. Singer Co.*, 542 F.2d 111, 116 (2d Cir.), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976). In this case the position Ballantine would have enjoyed but for the breach is estab-lished by reference to the sales achieved by "comparable" brewers between mid-1975 and the present. This method of computing damages has often been employed by the courts. In *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556 (2d Cir. 1970), which involved a claim of wrongful termination of a franchise to sell Peugeot automobiles, plaintiff proved his damages by, among other methods, comparison of the sales of Volvo automobiles, which had increased from 5,000 to 10,000 between 1965 and 1968, with sales of Peugeot automobiles which only rose from 700 to 900 during the same period. *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918 (2d Cir. 1977), was an action to recover damages for defendant's failure to use reasonable efforts to promote Contemporary's records, specifically the song "Fear No Evil", which had reached No. 61 on the Hit Parade at the time it was wrongfully withdrawn by defendant. After stating the general rule that a plaintiff who has proved injury "need only show a 'stable foundation for a reasonable estimate of royalties he would have earned had defendant not breached,'" *id.* at 926, quoting *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974), the Court approved a statistical method of comparison which tended to show that 51% of songs reaching No. 61 on the Hit Parade went on to reach No. 20 and consequently to achieve greater sales. Finally, in *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 260, 66 S.Ct. 574, 90 L.Ed. 652 (1946), the Supreme Court approved a method of computing damages based on a comparison of the profits of plaintiff's theatre, which had been deprived of first-run motion pictures by defendant, with the profits of a theatre of comparable size which had access to such films.

Mr. Robert S. Weinberg, former Vice-President of Anheuser-Busch and founder of R. S. Weinberg & Associates, a St. Louis management research firm, testified as an expert witness for plaintiff. He attempted to establish the performance of comparable brewers by comparing, for the years 1972 through 1977, the sales of Ballantine Beer

with the sales of six other groupings of beers for the same period. The brands compared were (1) Falstaff Beer; (2) all American brewers except the top 10; (3) all American brewers except the top 15; (4) all American brewers except the top 20; (5) all comparably sized brewers; and (6) all Eastern brewers. His graphs were based on the percentage of beer sold by Ballantine and by each of his groups of beers in comparison with their 1972 sales. Ballantine, for example, in 1977 sold only 32.95% of the volume sold in 1972, while Falstaff in that year sold 52.41% of its 1972 volume.

One preliminary adjustment must be made before considering the validity of Mr. Weinberg's comparables. In all of his charts and testimony he used 1972 as the base year to which performance was compared. His reasoning in adopting that year was based on the fact that Falstaff acquired Ballantine's assets in March 1972. Since, however, Ballantine has dropped all claims for failure to use best efforts before 1975, this reasoning is no longer valid and its use would result in grossly inflated damage figures. The proper comparison is with sales achieved for Ballantine brand and by comparable brewers in the last full year before Mr. Kalmanovitz acquired control of Falstaff, that is, 1974.

The basic theory underlying Mr. Weinberg's choice of "comparable" brewers was selection of companies facing and exploiting comparable opportunities:

"We really have examined comparable groups of companies, companies that we believe faced comparable opportunities in the marketplace, and we see that the Falstaff brand appeared to operate in the same economic regimen of these other brewers that we felt were comparable, brewers who had approximately the same economic opportunity, the same marketing opportunity.

But Ballantine sales declined further and we think at a significantly different pattern than Falstaff or comparable smaller brewers." (Tr. pp. 216–17.)

In its post-trial memoranda, Ballantine admitted certain problems with regard to groupings based on all but the top 10 and top 20 brewers, and was unable to provide accurate data for 1977 for brewers marketing in the eastern states. It concentrated its efforts on groupings of (1) all but the top 15 brewers (Ballantine ranked 16th in 1972); and (2) comparably sized brewers, wherever located.

The data for these two groupings is as follows (figures represent volume in barrels for each year and the percentage of each year's volume compared with 1974):

| | Comparably Sized Brewers | All But Top 15 Brewers |
|------|--------------------------|------------------------|
| 1974 | 15,972,000 | 16,131,000 |
| | 100% | 100% |
| 1975 | 12,750,000 | 16,492,000 |
| | 79.82% | 102.23% |
| 1976 | 12,943,000 | 14,335,000 |
| | 81.03% | 88.86% |
| 1977 | 12,590,000 | 11,755,000 |
| | 78.82% | 72.87% |

Ballantine's performance during this period was worse than either of these groupings, and also considerably worse than Falstaff:

| | Ballantine | Falstaff |
|------|-----------|-----------|
| 1974 | 1,407,000 | 4,289,000 |
| | 100% | 100% |
| 1975 | 975,000 | 3,643,000 |
| | 69.29% | 84.93% |
| 1976 | 583,000 | 3,289,000 |
| | 41.43% | 76.68% |
| 1977 | 519,000 | 2,559,000 |
| | 36.88% | 59.66% |

Falstaff has raised various objections to the comparability of different beers included in both of Mr. Weinberg's groupings of "comparables." While most of these objections are merely directed to the fact that sales of those products were relatively stable during this period, Falstaff's expert, Mr. Horowitz, also objected to the inclusion in the samples of specialty products, such as Champale (a malt liquor manufactured by Iroquois Brewery) and Country Club Malt Liquor (manufactured by Pearl Brewery), and the inclusion of "premium" and "light"

beers as comparables. Mr. Horowitz also objected to the geographical distribution of the samples.

These objections are regarded as lacking in merit. However, I find that a simpler and more accurate method of comparison is available. Both experts, Mr. Weinberg for Ballantine and Mr. Horowitz for Falstaff, considered Schaefer and Rheingold to be products comparable with Ballantine. Mr. Weinberg included both brands on relevant charts in plaintiff's Exhibit 114, and Mr. Horowitz testified explicitly to their comparability (Tr. p. 797). Based on this expert opinion, the Court finds that the Schaefer and Rheingold brands are comparable in market acceptance, and their experiences reveal what Ballantine's performance would have been but for Falstaff's breach of contract. If anything, the inclusion of Rheingold renders the comparison a conservative one. Rheingold's production has declined very considerably since the days when more votes were cast for models competing in the annual Miss Rheingold Contest than in presidential elections. In 1972, Rheingold was acquired by Pepsico, and Pepsico expressed at the time its intention of discontinuing the production of beer. (Plaintiff's Ex. 148.) The brewery was closed in early 1974 and production halted for a time. In March of that year Pepsico transferred Rheingold *gratis* to Chock Full O'Nuts, and in late 1977 the business was again sold, this time to Schmidt's Brewery. Furthermore, the sales of Rheingold for 1977 are themselves a low estimate of actual sales since they do not include sales of Rheingold Beer after the acquisition of Rheingold by Schmidt's.

| | 1974 (bbls.) | 1975 (bbls.) | 1976 (bbls.) | 1977 (bbls.) |
|---|---|---|---|---|
| Rheingold | 1,975,000 | 1,720,000 | 1,410,000 | 750,000 |
| Schaefer | 5,710,000 | 5,881,000 | 5,256,000 | 4,664,000 |
| Rheingold and Schaefer Combined | 7,685,000 | 7,601,000 | 6,666,000 | 5,414,000 |
| (Percentage of 1974 Production) | 100% | 98.90% | 86.74% | 70.44% |
| Ballantine | 1,407,000 | 975,000 | 583,000 | 519,000 |
| (Percentage of 1974 Production) | 100% | 69.29% | 41.43% | 36.88% |

Applying these percentages, I find that if Falstaff had used its best efforts to promote Ballantine Beer in the last four months of 1975, Ballantine would have sold 463,833.6 barrels (4 times 98.9% of Ballantine's monthly average production for 1974) rather than 324,970.4 barrels for the same period (5 times 69.29% of its average monthly production for 1974). Another way of expressing this is that in the last four months of 1975 Ballantine sold 29.6% less of its 1974 volume than would have been sold if best efforts had been used. The difference amounts to 173,579 barrels, or, on the basis of $.50 per barrel royalty, damages in the amount of $69,431.60.

In 1976, Ballantine would have sold 86.74% of its 1974 volume (1,220,431 barrels), rather than the 41.43% (582,920 barrels) actually sold. The difference is 637,511 barrels, or damages in the amount of $318,755.00.

In 1977 Ballantine would have sold 70.44% of its 1974 volume (991,090 barrels), rather than the 36.88% (518,901 barrels) actually sold. The difference is 472 barrels, or damages in the amount of $236,094.50.

Plaintiff has urged on the Court the proposition that one quarter (three months) of the 1977 deficiency be used as a basis for computing the damages for the anticipatory breach of the contract through March 31, 1978, the end of the contract period. In view of the downward sales trends established for the period 1974–1977, however,

such a method is unrealistic, and would be unfair to defendant. Based on those statistical trends, I find that in the first three months of 1978 Ballantine would have sold 30% of its 1974 volume (105,525 barrels) as compared with 50% of 1974 volume (175,875 barrels) if best efforts had been used. The difference is 70,350 barrels, or damages in the amount of $35,175.00.

The total amount of royalties lost to Ballantine, applying the percentages stated, amounts to $659,456.10. In order to assess damages against Falstaff for its failure to use best efforts as required, that sum must be reduced. As discussed *supra*, p. 272, 5.5% of the decline in sales after April 1976 is found to be attributable to Falstaff's commendable prohibition of illegal activities in the sale of all its products, including Ballantine. Expressed in dollars, this amounts to $29,193.50 of lost royalties for the period from April 1976 to March 1978. The requirement to use best efforts does not include the duty to continue past general practices of an illegal nature. Defendant attributes a portion of the lost royalties to the cessation of sales of Munich Beer at the beginning of 1978 and to the interruption of its distribution, and consequent loss of shelf-space and sales, in 1976 and after. Munich Beer was the same product as Ballantine, with a different label. It had been used to appeal to a lower price segment of the market, selling retail in the same areas as did Ballantine, at about 10% less. In this segment of the market, there was no value or good will shown to be attached to the name of Munich. There is insufficient evidence in the trial record to permit the Court to make a precise finding as to the lost sales attributable to the attack made on the Munich name by third parties. Apparently, Munich Beer was never sold in appreciable quantities in Falstaff's Southern, Southwestern, Pacific or Midwestern Regions. In the Great Lakes Region, sales of Munich Beer actually increased between 1974 and 1976 (from 2,759 barrels to 5,691 barrels). Almost all of Munich Beer produced was sold in the Atlantic and Northeast Regions. The sales figures for those areas combine Munich sales with sales of Ballantine India Pale Ale. In 1974 the two labels together sold 180,256 barrels; in 1975 they sold 90,102 barrels; and in 1976 they sold only 32,152 barrels. It was stipulated that in 1977 Munich Beer sales amounted to only 17,063 barrels. No Munich sales were registered in 1978. There was testimony of lost sales to the Dart Drug Store chain in Washington, D. C., but no proof as to the amount. (Tr. p. 386.) At most, in view of the lack of evidence, defendant is entitled to credit for the lost sales of Munich in the first quarter of 1978. Applying the same principles used above, lost Munich sales for that period would have been 3,469 barrels, reducing the lost royalties by $1,734.50.

Accordingly, the damages for Falstaff's breach amount to $628,528.10. These damages are reasonable under all the circumstances presented here. As our Court of Appeals stated in *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926–27 (2d Cir. 1977):

"[T]he burden of uncertainty as to the amount of damages is upon the wrongdoer, *Perma Research & Dev. v. Singer, supra*, 542 F.2d at 116, and the test for admissibility of evidence concerning prospective damages is whether the evidence has any tendency to show their probable amount. *Duane Jones Co. v. Burke*, 306 N.Y. 172, 192, 117 N.E.2d 237, 247–48 (1954). The plaintiff need only show a 'stable foundation for a reasonable estimate of royalties he would have earned had defendant not breached.' *Freund v. Washington Square Press, Inc., supra*, 34 N.Y.2d at 383, 357 N.Y.S.2d at 861, 314 N.E.2d at 421. 'Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection.' *Entis v. Atlantic Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964). '[T]he law will make the best appraisal that it can, summoning to its service whatever aids it can command.' *Sinclair Rfng. Co. v. Jenkins Co.*, 289 U.S. 689, 697, 53 S.Ct. 736, 739, 77 L.Ed. 1449 (1933)."

*Underpaid Royalties.* It is undisputed that between April 1, 1972 and November

30, 1975 Falstaff sold 5,108,908 barrels of Ballantine products, on which a royalty of $2,554,454.00 was due. It has been stipulated that during that period Falstaff paid to Ballantine only $2,513,054.50. The underpaid royalties due for that period thus amount to $41,399.50.

*Withhold Royalties.* Plaintiff is also entitled to receive its $.50 per barrel royalty on all sales of Ballantine products after November 30, 1975. These were unjustifiably withheld by Falstaff in anticipation of its counterclaims against Ballantine, all of which have been found lacking in merit. In the period from December 1, 1975 to December 31, 1977, Falstaff sold 1,159,241 barrels of Ballantine products, and the royalty due is $579,620.50. Using the method described above, Falstaff would have sold 105,525 barrels of Ballantine products (30% of Ballantine's 1974 volume) during the first quarter of 1978. The royalties due for this period amount to $52,762.50.

The sum total due to Balco is thus $1,302,310.60. Pre-judgment interest at 6% *per annum* is awarded, with the computation to be made in accordance with New York CPLR § 5001(b), with costs to be taxed.

Settle a judgment on waiver of notice, or on five (5) days notice of settlement, to be submitted together with a computation of the pre-judgment interest from the respective dates for payment to and including the date of settlement and filing of the judgment. Such judgment should be received for signature on or before July 27, 1978.

The foregoing shall constitute findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.