In re FLAG TELECOM HOLDINGS LIMITED, Flag Limited, Flag Pacific USA Limited, Flag Telecom Group Services Limited, Flag Telecom USA Ltd., Flag Asia Limited, Flag Atlantic Holdings Limited, Flag Atlantic Limited, Flag Atlantic USA Limited, Debtors.

Flag Telecom Group Limited, Flag Asia Limited, Flag Telecom Asia Limited, Flag Telecom Taiwan Limited and Flag Telecom Japan Limited, Plaintiffs,

v.

Kensington International, Ltd., Springfield Associates, LLC, Elliott Associates, L.P., Elliott International, L.P., Wilmington Trust Company, and the Bank of New York, Defendants.

Bankruptcy Nos. 02–11732 to 02–11736, 01–11975 to 02–11979. Adversary No. 03–06712.

United States Bankruptcy Court, S.D. New York.

Feb. 10, 2005.

Gibson, Dunn, & Crutcher LLP, By Craig H. Millet, Esq., Alison C. Gooding, Esq., Michelle M. Craven, Esq., New York, for the Plaintiffs/Debtors.

Kleinberg, Kaplan, Wolff & Cohen, P.C., By David Parker, Esq., Edward P. Grosz, Esq., New York, for Defendants: Kensington International, Ltd.; Springfield Associated, LLC; Elliott Associates, L.P. and Elliott International, L.P.

## MEMORANDUM OF DECISION

ALLAN L. GROPPER, Bankruptcy Judge.

On August 3, 2003, the above-captioned plaintiffs (collectively the "Companies") filed this adversary proceeding seeking a declaratory judgment that they were not in default on a Note issued under the confirmed Plan of Reorganization of the principal obligor, FLAG Asia Limited ("FLAG Asia"). The Note was originally issued to a major creditor, Alcatel Submarine Networks, S.A. ("Alcatel"). On April 25, 2003, the Note (the "Alcatel Note") was acquired by Kensington International, Ltd., Springfield Associates, LLC, Elliott Associates, L.P., and Elliott International, L.P. (collectively the "Elliott Group").

For the reasons set forth below, this Court finds that the Companies were not in default of their obligations under the Alcatel Note and that they are entitled to summary judgment in their favor.

## Background

In early 2002, certain of the Companies contracted with Alcatel for the construction of the FLAG West Asia Cable System (the "FWACS"), an integrated fiber optic network linking Japan, Hong Kong, and South Korea. Alcatel had also been engaged by Reach, Ltd. ("Reach") as a subcontractor for the construction of the North Asia Cable System ("NACS") linking several nations in North Asia. Reach and the Companies had agreed to operate the NACS and the FWACS together as the FLAG North Asian Loop ("FNAL"). Altogether, the FNAL consists of six fiber "pairs"; construction was intended to proceed in three phases: Phase 1 was to be completed by March 2002, Phase 2 by May 2002 and Phase 3 by June 2002. The Companies and Reach each own three of the pairs.

The pre-petition contract between the Companies and Alcatel was largely, but not entirely performed when, on March 29, 2002, the Companies ceased payments to Alcatel, and Alcatel ceased work on the FNAL. This led directly, on April 12, 2002, to the petitions under Chapter 11 of the Bankruptcy Code. At the time of the filings, Alcatel was owed more than $80 million. The Companies achieved substantial success in their Chapter 11 cases, negotiating agreements with diverse creditor groups and, with respect to the matters at hand, an agreement with Alcatel whereby Alcatel resumed work and in return received cash and, pursuant to a plan of reorganization, a note—the "Alcatel Note"—for the outstanding balance as of the effective date of the plan. On September 26, 2002, the Court confirmed the Debtors' Third Amended Plan of Reorganization (the "Plan").

## The Alcatel Secured Note

The Alcatel Note was secured and required FLAG Asia, defined as the "Debtor/Payor", to grant Alcatel a nonpossessory security interest in, among other things, one of the FNAL fiber pairs mentioned above and in the equipment at various FNAL base stations in the relevant nations in Asia (collectively the "Collateral"). Section 5 of the Alcatel Note specifically required FLAG Asia, on or before December 31, 2002, to "take all actions to the maximum extent permitted by applicable law ... reasonably necessary to ensure the legality, enforceability, and validity of such Security Interest on the Collateral." Failure to properly perfect the Security Interest (as defined) would permit the holder to call an event of default under the Alcatel Note. Pursuant to the Alcatel Note, the parties entered into the FNAL Security Agreement governing the creation of the Security Interest in the Collateral. The Wilmington Trust Company ("WTC") was appointed collateral agent under the FNAL Security Agreement and had the right under that Agreement to appoint co-collateral agents if necessary.

On October 10, 2002, pursuant to the FNAL Security Agreement, FLAG Asia filed a UCC–1 financing statement in Washington, D.C. covering the Collateral, and it also eventually effected filings in Japan, Hong Kong, and South Korea.[1] However, it confronted numerous problems with registering the FNAL Security Agreement in Taiwan. The major perceived obstacle at that time was a requirement of Taiwanese law that the parties to a security agreement had to be locally based. WTC had no presence in Taiwan, and it was unclear whether Taiwanese law permitted the parties to register a nonpossessory collateral security agreement between a Taiwan entity and a foreign creditor operating through a co-collateral agent.[2] Notwithstanding this uncertainty, WTC apparently attempted to locate a co-collateral agent with the requisite presence in Taiwan. Beginning in January 2003, WTC, the only party with power to appoint a co-collateral agent, actively sought potential agents who had sufficient contacts in Taiwan. WTC eventually identified five candidates; however, by February 26, 2003, all but The Bank of New York ("BONY") had withdrawn from consideration. On April 25, 2003, BONY requested WTC pay its legal fees in connection with an investigation into a possible agency relationship.

A few days before BONY's request, on April 21, 2003, members of the Elliott Group had purchased the Alcatel Note for less than half its face value. On April 25, 2003, WTC contacted the Elliott Group representing the new holders of the Note, concerning the issue of registration of the Note in Taiwan; however, the Elliott Group provided no instructions on how WTC was to proceed. WTC then halted its efforts to find a trustee or co-collateral agent. Sometime thereafter, BONY apparently indicated it would be unwilling to serve as a trustee or co-collateral agent.

---

1. The FNAL Security Agreement had special provisions relating to perfection actions in South Korea, apparently based on the difficulty in registering security interests there: "Notwithstanding anything in this Section 5 to the contrary, with respect to South Korea, [FLAG] shall only be required to use their respective best commercially reasonable efforts to" perfect the security interests in the Collateral. The parties were able to perfect the South Korean interests by entering into a separate agreement, the "Yango Dumbo" security agreement.

2. The Taiwan Entity was FLAG Telecom Taiwan Limited ("FLAG Taiwan"), one of the Companies and one of the parties to the FNAL Security Agreement.

**The Series A, B, and C Notes**

In addition to the Alcatel Note, pursuant to the Chapter 11 Plan, certain of the Companies issued $50.25 million in Series A, B and C notes (the "Indenture Notes") under an Indenture, as to which BONY also serves as Indenture Trustee. The Companies were entitled to redeem the Indenture Notes at two-thirds their face value on 60 days' notice during the 18 months after issuance so long as there was no subsisting event of default under the Indenture. If the Companies were in default of their obligations under these Notes, the holders could seemingly force them to redeem the Indenture Notes at full face value, which would require the payment of 100% of the face value of the Series A Notes and in excess of the face value of the Series B and C Notes. The Indenture Notes defined various events of default; in addition, a cross-default provision provided that an event of default could be declared on "the occurrence of any other Event of Default with respect to any other series of securities", including the Alcatel Note. (Indenture at § 9.01(i).)

On July 25, 2003, the Companies sent notice to the Series A Noteholders that they intended to redeem the Notes at a price equal to a two-thirds reduction in face value. By that time the Elliott Group had also become substantial holders of these Notes, and on August 1, 2003, sent the Companies a notice of default, asserting that the Alcatel Note was in default by virtue of the failure to perfect a security interest in Taiwan and that the Indenture Notes were in default as a consequence of the cross-default clause. The Elliott Group demanded that the Companies either cure the Alcatel default or immediately pay the face value of the Alcatel Note prior to redeeming the Indenture Notes. In response, the Companies filed this adversary proceeding, seeking a declaratory judgment that they were not in default of the Indenture Notes or the Alcatel Note and enjoining the Elliott Group from accelerating the amounts due under the Alcatel Note.

The Companies initially sought and received a preliminary injunction against the Elliott Group preventing it from immediately declaring a default on the Alcatel Note. Judge Drain (who heard the case in the absence of the undersigned) granted the injunction, finding in an oral opinion that the Companies had demonstrated irreparable harm and were likely to succeed on the merits. The Companies proceeded to redeem the Indenture Notes at the contractual discount, with the Elliott Group reserving its rights as to full payment.

FLAG Asia, on January 26, 2004, about five months later, satisfied the Alcatel Note in full, mooting any outstanding issue as to a default under that Note. The remaining issue for decision on this motion is whether the Alcatel Note was in default when the Companies redeemed the Indenture Notes and whether the Companies must pay the Elliott Group the one-third discount.

**Discussion**

■ Summary judgment under Rule 56 should be granted only where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must resolve all ambiguities and draw all reasonable factual inferences in favor of the party against whom summary judgment is sought. *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986). The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," indicating those that a reasonable trier of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[3]

**The Issue on This Motion**

The Companies initially argued on this motion for summary judgment, as they had in their motion for a preliminary injunction at the outset of this case, that the filing of a UCC–1 registration statement in Washington D.C. satisfied the Alcatel Note's requirement of registration with respect to the Taiwan Collateral. This contention is based on the fact that the Alcatel Note and the FNAL Security Agreement are both governed by New York law, and that under the revised Uniform Commercial Code, applicable in New York, perfection of a nonpossessory security interest for a debtor located outside the United States is governed by District of Columbia law if the debtor's principal place of business is not located in a jurisdiction "whose law generally requires information concerning the existence of a nonpossessory security interest to be made generally available in a filing, recording or registration system ...." N.Y. U.C.C. § 9–307(c).

The holder or holders of the Taiwan Collateral are located in Asia, principally or exclusively in Taiwan. It may well be that the Taiwanese recording system is not "a filing, recording or registration system" adequate to satisfy the requirements of U.C.C. § 9–307(c). As has been observed, not many foreign systems meet the requirements of the U.C.C. in this regard.

See Carl S. Bjerre, *International Project Finance Transactions: Selected Issues Under Revised Article 9*, 73 AM. BANKR. L.J. 261 (1999). Thus, it may be that FLAG Asia's filing in the District of Columbia satisfied its obligation to perfect a security interest in the Taiwan Collateral; as noted above, Judge Drain found on the preliminary injunction record that the Companies had a probability of success on this issue.

On this motion for summary judgment, however, the Elliott Group argues that questions of fact exist as to whether the phrase "applicable law" in the Alcatel Note referred specifically to Taiwanese law, with the result that FLAG Asia was required to "take all actions to the maximum extent permitted by [*Taiwanese*] law ... reasonably necessary to ensure the legality, enforceability, and validity of such Security Interest" on the Taiwan Collateral. For purposes of this motion, it is assumed that the Alcatel Note's reference to "applicable law" includes Taiwanese law. Therefore, the question for decision—and the question as the parties implicitly formulated it at the time of oral argument—is whether FLAG Asia took "all actions to the maximum extent permitted by [Taiwanese] law reasonably necessary to ensure the legality, enforceability, validity and perfection of such Security Interest on the Collateral ...." To decide that question requires a determination as to (i) what the applicable documents required and (ii) what the law of Taiwan *permitted* with respect to the perfection of such Security Interest in the Taiwan Collateral.

**3.** The Court notes that the Elliott Group did not cite any cases in support of its legal arguments. Consistent with this pattern, it also contended in a one-sentence footnote that this Court lacks jurisdiction over this case. To the extent this was taken as a serious position, the Court finds that it has jurisdiction over the construction of documents issued pursuant to a confirmed plan of reorganization. See *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223 (2d Cir. 2002).

**The Performance Required of the Companies**

### 1. The Applicable Documents

Section 5 of the Alcatel Note provides for the Note to be secured and reads as follows:

*Security Interest.* The provisions of the FNAL Security Agreement will be effective to create in favor of the Collateral Agent, commencing on the Date of Issuance and continuing for so long as any amounts under this Note remain outstanding, a Security Interest in the Collateral. Commencing no later than October 15, 2002, *the Debtor/Payor and its Related Operating Companies shall take all actions to the maximum extent permitted by applicable law (the "Perfection Actions") reasonably necessary to ensure the legality, enforceability, validity and perfection of such Security Interest on the Collateral and* will continue to take such action as is necessary to maintain the legality, enforceability and validity of such Security Interest for so long as any portion of this Note remains outstanding; *provided however, in the event such Security Interest is not perfected by December 31, 2002, it shall be an Event of Default for all purposes hereunder.* Notwithstanding anything in this *Section 5* to the contrary, with respect to any Perfection Actions to be taken by the Debtor/Payor and its related Operating Companies in South Korea, Debtor/Payor shall only be required to use their respective best commercially reasonable efforts to effect the Perfection Actions no later than March 31, 2003 and shall keep the Collateral Agent and the Holder reasonably informed as to its progress with respect thereto. All capitalized terms used in this *Section 5* and not defined in this Note shall have the meanings ascribed thereto in the FNAL Security Agreement. (italics added)

The parties thus agreed that the Security Interest was to be provided pursuant to the FNAL Security Agreement, and the FNAL Security Agreement, which defines the Collateral, was in fact entered into concurrently with the Note.[4] All necessary actions had to be taken commencing no later than October 15, 2002 (six days after the date of the Alcatel Note and the FNAL Security Agreement) and, with respect to perfection of an interest in the Collateral in Taiwan and Japan, § 5 of the Alcatel Note provided that if such Security Interest was not perfected by December 31, 2002, "it shall be an Event of Default for all purposes hereunder." As noted above, a special provision was included with respect to Perfection Actions to be taken in South Korea.

The FNAL Security Agreement also provided for the grant of a lien on the Collateral, as defined, and for the appointment of Wilmington Trust as Collateral Agent. Although the Note sets forth a deadline for taking all necessary actions permitted under applicable law, neither the Note nor the FNAL Security Agreement specified the exact requirements for perfection of the Security Interest in the Collateral. Further, each FLAG entity irrevocably authorized the Collateral Agent (or Alcatel) to file initial financing statements or amendments in any U.C.C. jurisdiction, and as further assurances, "upon written request of the Collateral Agent," each FLAG entity would at its expense "take such further actions as Collateral Agent may reasonably deem desir-

---

4. FLAG Asia Limited was the sole obligor on the Alcatel Note. However, its local subsidiaries, including FLAG Taiwan, were parties to the FNAL Security Agreement as "Related Operating Companies."

able to obtain the full benefits of this Security Agreement and of the rights and powers herein granted, including ... filing any financing or continuation statements under the [Uniform Commercial] Code with respect to the Security Interests granted hereunder or any other Loan Document as to those jurisdictions that are not Uniform Commercial Code Jurisdictions." (FNAL Security Agreement § 5(a)(i).)[5] It was further provided that except as set forth in the FNAL Security Agreement, "the Collateral Agent shall not be required to take any other action under the Loan Documents or to execute any additional agreement, including, without limitation, any action to perfect, protect or preserve any Security Interest granted in this Security Agreement ... unless instructed in writing to do so by Alcatel or any of Alcatel's successors or assigns." (FNAL Security Agreement § 26(d).)

## 2. The Companies' Compliance

█ It is plain from these carefully drafted documents that FLAG Asia had the burden of taking "all actions to the maximum extent permitted by applicable law ... reasonably necessary to ensure the legality, enforceability, and validity of such Security Interest on the Collateral." This is a very high burden, and performance to the "maximum extent of applicable

law" anticipates more than just "best efforts."[6] Thus, for purposes of this motion, it is assumed that the Companies were required to register "such Security Interest"—*i.e.*, the security interest created pursuant to the FNAL Security Agreement—with the Taiwanese authorities if registration of the FNAL Security Agreement was "permitted" under Taiwanese law and would result in an enforceable security interest there.

There is no issue on the record of this motion that registration of the FNAL Security Agreement was *not* permitted under Taiwanese law and could not have resulted in an enforceable security interest in that jurisdiction. The parties have submitted on this motion conflicting affidavits from Taiwanese counsel as to the requirements of Taiwanese law with respect to the registration of foreign security interests. The principal issue of contention among the experts is the issue that most concerned the parties at the time—whether a Taiwanese co-collateral agent could have perfected a security interest in Taiwan under the law in effect at that time. On this motion for summary judgment, the Court will accept *arguendo* the position of the Elliott Group that at the time Taiwanese law might have permitted an entity without a presence in Taiwan to register a security interest through an agent or trustee.[7]

---

5. The term "Loan Document" is defined in the Alcatel Note as meaning the Note, the FNAL Security Agreement, a guarantee (not at issue herein) and "each other agreement, instrument, document, undertaking or certificate executed or delivered pursuant to any of the foregoing." (Alcatel Note, § 10.) The FNAL Security Agreement also provided that the Collateral Agent was authorized to appoint any person to act as co-collateral agent "for the purpose of meeting any legal requirements of any jurisdiction in which any of the Collateral may at the time be located." (FNAL Security Agreement, § 27.)

6. Section 5 of the Alcatel Note, requires the Debtors to take all actions to the "maximum extent of applicable law" with respect to registering the Security Interest in all jurisdictions except South Korea, where the Debtors were only required to use their commercially best efforts and the Debtors had more time to effect the registration.

7. The Elliott Group's expert points to one transaction where an entity with no presence in Taiwan was able to register its security interest. In that transaction, the foreign creditor assigned its rights to both the collateral and the debt to the Fubon Bank, which agreed to act as a trustee. The registration

In any event, there is no dispute on this record that Taiwanese law did not permit the registration of the FNAL Security Agreement as a valid, enforceable agreement. The opinion of the Elliott Group's expert is completely clear on this point. As Anthony Minton Lo, an attorney with the Taipei law firm of Yangming Partners explained, it would have been impossible for the Companies to register the security interest created in the FNAL Security Agreement as an enforceable agreement. Under the law of Taiwan, "With respect to the rights over things, the *lex loci rei sitae* shall apply." (Decl. of Anthony Minton Lo at 9.) As the Elliott Group's expert states flatly: "Failure to enter into a Taiwan law-governed chattel mortgage agreement for the Taiwan Collateral would prevent the enforcement of a security interest in such property in Taiwan." (Decl. of Anthony Minton Lo at 9.) Thus, in order to have an enforceable security interest in Taiwan, that interest would have to be created pursuant to an agreement governed by Taiwanese law. (See also, to the same effect, the Decl. of the Companies' expert, David Wen-tang Su at 5.)

The parties do not dispute that the security interests created by the FNAL Security Agreement were created under a document governed by New York law. Nor is there any question under the plain language of § 5 of the Alcatel Note that it was the Security Interest created pursuant to the FNAL Security Agreement ("such Security Interest") that had to be registered as an enforceable agreement. Thus, based solely on the evidence of the Elliott Group's own expert, it is uncontested on this record that registration of the FNAL Security Agreement as an enforceable agreement was not "permitted" under the

law of Taiwan, and that failure of FLAG Asia to register such Security Interest was not a default under the Alcatel Note.

There is no need to speculate whether the parties could have entered into a separate security agreement governed by Taiwanese law to register a security interest there, as they apparently agreed to do with respect to the Collateral in South Korea. Neither the Note nor the FNAL Security Agreement *required* the Companies to enter into a separate security agreement covering the Taiwanese Collateral, nor did anything in the plain language of the documents require the parties to create supplemental security agreements for each jurisdiction. As quoted above, a "further assurances" clause in the FNAL Security Agreement required the maker of the Note and its "Related Operating Companies," including FLAG Taiwan, to "take such further actions as Collateral Agent may reasonably deem desirable to obtain the full benefits of this Security Agreement and of the rights and powers herein granted . . . ." But action was only required "upon written request of the Collateral Agent," and the Collateral Agent was not required to act or execute any further agreement "unless instructed in writing to do so by Alcatel or any of Alcatel's successors or assigns." (FNAL Security Agreement, §§ 5(a)(i) and 26(d).) The Elliott Group does not argue that the Collateral Agent requested the Companies to enter into a separate security agreement covering Taiwan—assuming *arguendo* that it would have been possible to do so—or that either Alcatel or the Elliott Group as its assignee asked the Collateral Agent to make such a request.

officials then registered the security interest after a delay of many months. (Decl. of An-

thony Minton Lo at 9–11.)

Whether performance meets the standard required under a contract is often a question of fact, as the Elliott Group argues. *Bloor v. Falstaff Brewing Corp.,* 454 F.Supp. 258, 265 (S.D.N.Y.1978), *aff'd,* 601 F.2d 609 (2d Cir.1979). However, here the Elliott Group's own expert has confirmed that perfection of the Security Interest provided for by the parties was not "permitted" by Taiwanese law. Indeed, even if the governing documents had not required the Companies to do only what was "permitted" under foreign law, such a contractual condition would be implied. Parties cannot ordinarily contract to perform the impossible; the doctrine of impossibility is implicated where "performance is forbidden or prevented by law or decree or administrative action in that location." 14 *Corbin on Contracts* § 76.10 (interim ed.2002). So long as the contracting party is acting in good faith, it is "discharged from duty when the performance" could not be effected pursuant to local law. *Id.* See also Restatement 2d, *Contracts* § 266 (1981). No issue has been raised as to the Companies' good faith.

The Elliott Group also argues that a determination of the requirements of foreign law is a question of fact that requires a trial. However, Fed.R.Civ.P. 44.1, applicable here through Bankruptcy Rule 9017, explicitly provides that a court's determination of an issue of foreign law "shall be treated as a ruling on a question of law." Furthermore, a court has wide latitude in determining foreign law and "may consider any relevant material or source ... whether or not submitted by a party or admissible under [the Rules of Evidence]." Fed.R.Civ.P. 44.1. The Second Circuit has urged the lower courts "to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations." *Curley v. AMR Corp.,* 153 F.3d 5, 13 (2d Cir.1998). Thus, especially where there is no disputed issue, the Court may determine on the papers the requirements of Taiwanese law as they pertain to the case at bar.

In the instant case, it is assumed that FLAG Asia was required to take all steps to the maximum extent permitted by Taiwanese law to perfect the Security Interest in Taiwan. Under the circumstances, however, Alcatel and its assignees bore the risk that applicable law would not "permit" perfection of the FNAL Security Agreement there.[8] The Alcatel Note did not require the Companies to perfect any security interest other than the one created under the FNAL Security Agreement, and they did not default in their obligations under that Note.

## Conclusion

Based on the foregoing, the failure to perfect the FNAL Security Interest in Taiwan was not an event of default under the Alcatel Note, there was no cross-default under the Indenture Notes, and summary judgment is granted in favor of the Companies. The Companies shall settle an order on five days' notice.

---

8. There is uncertainty, of course, as to how much risk there was. It should be recalled that the holder of the Alcatel Note was also protected by the filing in the District of Columbia.