In re FLAG TELECOM HOLDINGS LIMITED, Flag Limited, Flag Pacific USA Limited, Flag Telecom Group Services Limited, Flag Telecom USA Ltd., Flag Asia Limited, Flag Atlantic Holdings Limited, Flag Atlantic Limited, Flag Atlantic USA Limited.

Kensington International, Ltd.; Springfield Associates, LLC; Elliott Associates, L.P.; Elliott International, L.P.; Wilmington Trust Company; and the Bank of New York, Appellants,

v.

Flag Telecom Group Limited, Flag Asia Limited, Flag Telecom Asia Limited, Flag Taiwan Limited and Flag Telecom Japan Limited, Appellees.

No. 05 Civ. 5724(NRB).

United States District Court, S.D. New York.

Dec. 13, 2005.

David Parker, Edward P. Grosz, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York City, Christopher Heisenberg, Winston & Strawn, LLP, New York City, Howard M. Rogatnick, Bryan Cave LLP, New York City, for Appellants.

Craig H. Millet, Gibson, Dunn & Crutcher LLP, Irvine, CA, Michelle M. Craven, Gibson, Dunn & Crutcher LLP, New York City, for Appellees.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Kensington International, Ltd. ("Kensington"), Springfield Associates, LLC ("Springfield"), Elliott Associates, L.P., Elliott International, L.P. (together, "Elliott"), Wilmington Trust Company ("WTC"), and the Bank of New York ("BNY") (collectively, "appellants") appeal from a decision of the United States Bankruptcy Court (Gropper, J.) granting the above-captioned plaintiff-appellees' (collectively, "FLAG") motion for a declaratory judgment that they did not default on a Note issued pursuant to the confirmed Plan of Reorganization of the principal obligor, FLAG Asia Limited ("FLAG Asia"). FLAG cross-appeals from the Bankruptcy Court's holding that FLAG is not entitled to attorney's fees. For the reasons discussed below, the Bankruptcy Court's grant of summary judgment to FLAG is vacated and the case is remanded to the Bankruptcy Court for proceedings consistent with this opinion.

## BACKGROUND

### I. Facts

FLAG operates a global telecommunications network of advanced fiber optic cable systems and interfaces. In early 2002, FLAG's predecessor, FLAG Telecom Holdings, Ltd. ("FLAG Telecom"), entered into a contract with Alcatel Submarine Networks, S.A. ("Alcatel"), providing for the construction of the FLAG West Asia Cable System ("FWACS"), a fiber optic network linking Japan, Hong Kong, and South Korea. Alcatel also entered into a subcontractor relationship with Reach, Ltd. for the purpose of constructing the North Asia Cable System ("NASC"), which FLAG would operate together with the FWACS as the FLAG North Asian Loop ("FNAL"). In total, the FNAL was planned to consist of six fiber pairs running between Hong Kong, Korea, Japan and Taiwan.

On March 29, 2002, FLAG Telecom ceased payments to Alcatel due to financial difficulties, and Alcatel consequently halted construction of the FNAL. At this time, the FNAL was nearly completed, but Alcatel was owed more than $80 million by FLAG Telecom. On April 11, 2002, FLAG Telecom filed for bankruptcy under Chapter 11 of the Bankruptcy Code. In October 2002, FLAG Telecom completed its Chapter 11 plan of reorganization, under which Alcatel agreed to resume work in exchange for cash payments and a note (the "Alcatel Note") issued in the principal amount of $27,351,461. Section 5 of the Alcatel Note states, in relevant part:

> Commencing no later than October 15, 2002, the Debtor/Payor [FLAG Asia] and all its Related Operating Companies shall take all actions to the maximum extent permitted by applicable law ... reasonably necessary to ensure the legality, enforceability, validity and perfection of such Security Interest on the Collateral and will continue to take such action as is necessary so as to maintain the legality, enforceability, and validity of such Security Interest for so long as any portion of this Note remains outstanding; *provided, however,* in the event such Security Interest is not perfected by December 31, 2002, it shall be an Event of Default for all purposes hereunder.

Alcatel Note, § 5 (emphasis in original). Section 5 also explicitly exempts FLAG Asia from the "maximum extent permitted by applicable law" requirement regarding

its perfection efforts in South Korea, specifying that FLAG Asia need only make its "best commercially reasonable efforts" to perfect there. *Id.* Thus, as relevant to this dispute, the "maximum extent" language applies to the collateral located in Taiwan (the "Collateral").

The Alcatel Note was secured by a security agreement (the "Security Agreement") creating a nonpossessory security interest (the "Security Interest") in one of the six fiber pairs that comprise the FNAL. The Security Agreement contains four clauses relevant to this action. First, Section 5(a), entitled "Covenant: Further Assurances," states:

> At any time . . . upon the written request of Collateral Agent, and at the sole expense of the Grantors [FLAG], each Grantor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as Collateral Agent may reasonably deem desirable to obtain the full benefits of this Security Agreement. . . .

Security Agreement, § 5(a). Second, Section 10 specifically names WTC as Alcatel's collateral agent. *See Id.* at § 10(b). Third, the Security Agreement provides that the "Collateral Agent shall have the power to appoint . . . [a] co-collateral agent, or co-collateral agents. . . ." *Id.* at § 27(a). Finally, the Security Agreement explicitly states that it is governed by New York law, as does the Alcatel Note. *See* Security Agreement, § 17 ("This Security Agreement and all disputes with respect hereto shall be governed by, and construed in accordance with, the laws of the State of New York . . . ."); *see also* Alcatel Note (identical language).

In addition to the Alcatel Note, FLAG also issued Series A, B, and C Indenture Notes (the "Indenture Notes") to former bondholders and to two administrative claimants. Elliott purchased $9 million worth of the Series A Notes, which, along with the other Indenture Notes, were secured by all existing and after-acquired FLAG property, with limited exceptions. The Indenture provides that FLAG had the right to redeem the Series A Notes for two-thirds of their face value within eighteen months of their issuance. However, this discounted right of redemption was unavailable to FLAG if it defaulted on its obligations under either the Indenture or under the Alcatel Note, pursuant to a cross-default clause contained in the Indenture. *See* Indenture at § 9.01(i). Whether FLAG was in default under the terms of the Alcatel Note when it sought to redeem the Series A Notes is the primary subject of dispute between the parties.

On October 10, 2002, FLAG Asia filed a UCC–1 financing statement in Washington, D.C., consistent with its obligation under the Security Agreement to perfect the Collateral. FLAG then sought to register the FNAL security agreement in Taiwan.[1] However, Taiwanese law only permits local parties to register security agreements. In trying to enter into an arrangement with a local party in order to enable it to perfect the Collateral, FLAG twice sought and received extensions of the original December 31, 2002 deadline, allowing FLAG until July 20, 2003 to perfect. Consequently, in early 2003, WTC, which has no presence in Taiwan, attempted to locate a co-collateral agent in Taiwan. WTC entered into negotiations with five potential co-collateral agents. At that

---

1. In 2003, FLAG executed three separate agreements with WTC in order to perfect WTC's security interest in Hong Kong, Japan, and South Korea in conformity with each country's respective legal requirements.

time, no Taiwanese entity had ever attempted to register a security interest that extended beyond Taiwan's territorial jurisdiction.

Of the five financial institutions WTC approached, four declined its offer to serve as a co-collateral agent for FLAG. Counsel for JPMorgan Chase ("JPMorgan"), one of the four financial institutions to reject FLAG's proposal, researched the legal issues involved and concluded that "Taiwan laws do not recognise the concept of a security/collateral agent." Email of Ophelia Fung, dated February 13, 2003.[2] On April 24, 2003, BNY's Taiwanese branch informed WTC and FLAG that it might still be interested in acting as a co-collateral agent, but was concerned with being "stuck with a legal bill" if it eventually determined that it could not "participate in the transaction." Email of Sandra R. Ortiz, dated April 24, 2003. BNY thus insisted on a legal retainer if WTC desired that it continue to explore entering into a co-collateral arrangement. *See id.* Neither FLAG nor WTC ever offered a retainer, and there were no further negotiations with BNY.

On April 25, 2003, the day after BNY requested a retainer, members of the Elliott Group, including Kensington, purchased the Alcatel Note for less than half its face value. That same day, WTC contacted Elliott and inquired about how it should proceed regarding its Taiwanese perfection efforts. Elliott did not respond to this inquiry. WTC subsequently abandoned its efforts to find a co-collateral agent in Taiwan.

On July 25, 2003, FLAG sent a notice to Series A noteholders informing them that it intended to redeem their notes at the two-thirds discounted rate provided for in

the Indenture. However, Elliott, which now owned both the Alcatel Note and a significant amount of the Series A Notes, sent FLAG a notice on August 1, 2003, maintaining that the Alcatel Note was in default because FLAG had failed to perfect the security interest in Taiwan. Because of the cross-default clause included in the Indenture, a default on the Alcatel Note would also constitute a default on the Series A Notes. Consequently, Elliott demanded that FLAG either cure the alleged default or immediately pay the face value of the Alcatel Note before redeeming the Series A Notes. On August 23, 2003, FLAG filed this action, seeking a declaratory judgment that it did not default on the Alcatel Note. Five months later, on January 26, 2004, FLAG Asia satisfied the Alcatel Note in full, rendering any consequences of a potential default moot. Thus, the only issue before the Bankruptcy Court was whether Elliott, as well as the other note holders, represented here by BNY, is entitled to the full value of the Series A Notes, rather than the two-thirds of their value paid by FLAG.

## II. Bankruptcy Court Ruling

FLAG's motion for summary judgment was granted on February 10, 2005. *See In re Flag Telecom Holdings Ltd.* (hereafter *"Flag"*), 320 B.R. 763 (Bankr.S.D.N.Y. 2005). The Bankruptcy Court held that no default had occurred under the Alcatel Note, finding that FLAG's filing of the UCC–1 filing statement in Washington, D.C., "satisfied the Alcatel Note's requirement of registration with respect to the Taiwan collateral." *Id.* at 767.

In so finding, Judge Gropper considered Elliott's argument that the phrase "appli-

---

**2.** In that same email, however, JPMorgan suggested there might be an alternative way of perfecting the agreement in Taiwan, by creating a "joint and several lender" structure. This type of arrangement was apparently never pursued by FLAG or WTC.

cable law" in Section 5 of the Alcatel Note referred to Taiwanese law, rather than New York law, as FLAG argued. The Court, in making all reasonable inferences in favor of the non-moving party, assumed *arguendo* that Elliott's interpretation was correct, but concluded that "registration of the FNAL Security Agreement was *not* permitted under Taiwanese law and could not have resulted in an enforceable security interest under Taiwanese law," *id.* at 769 (emphasis in original), a fact that neither party disputed in oral argument before this Court. The Bankruptcy Court then noted that "in order to have an enforceable security interest in Taiwan, that interest would have to be created pursuant to an agreement governed by Taiwanese law," *id.* at 770, but concluded that, "[t]here is no need to speculate whether the parties could have entered into a separate security agreement governed by Taiwanese law to register a security interest there ... [because] [n]either the Note nor the FNAL Security Agreement *required*" them to do so. *Id.* (emphasis in original). In reaching the conclusion that FLAG did not need to solicit a co-collateral agent, the Court relied on Section 26(d) of the Security Agreement, which provides:

> "Except as set forth in this Security Agreement, the Collateral Agent shall not be required to ... execute any additional agreement, including, without limitation, any action to perfect, protect or preserve any Security Interest granted in this Security Agreement or to administer any Collateral, unless instructed in writing to do so by Alcatel or any of Alcatel's successors or assigns. If Collateral Agent shall request instructions from Alcatel or any of Alcatel's succes-

sors or assigns with respect to any act or action ... in connection with this Security Agreement or any other Loan Document, then Collateral Agent shall be entitled to refrain from such act or taking such action unless and until Collateral Agent shall have received instructions in writing from Alcatel or any of Alcatel's successors or assigns...."

Security Agreement § 26(d). Because appellants did not instruct WTC to request that FLAG enter into a new agreement in order to perfect the Taiwan Collateral, regardless of the legality of doing so, the Court found that FLAG did not default on the Alcatel Note as a matter of law. The Bankruptcy Court thus concluded that the filing of UCC–1 statements in Washington, D.C. fulfilled FLAG's perfection obligations, and granted its motion for summary judgment.

## DISCUSSION

### I. Standard of Review

■ When reviewing a Bankruptcy Court's decision, we "accept[ ] its factual findings unless clearly erroneous but review[ ] its conclusions of law *de novo*." *In re DG Acquisition Corp.*, 151 F.3d 75, 79 (2d Cir.1998). This appeal raises two issues of law for our review: (1) whether FLAG's failure to perfect the Taiwan Collateral was an event of default, as defined by the Alcatel Note, and (2) whether FLAG is entitled to attorney's fees. Accordingly, our review is *de novo*.

### II. Issues on Direct Appeal

■ Appellants offer numerous grounds for reversing the decision of the Bankruptcy Court.[3] Generally, they con-

---

**3.** Several of these arguments are premised on the notion that the Bankruptcy Court incorrectly applied the doctrine of legal impossibility, an affirmative defense that may not be

raised *sua sponte*. However, it is clear that the Court's mention of the doctrine, *see Flag*, 320 B.R. at 771, was not crucial to its decision. Moreover, because we reverse on other

tend that regardless of whether Taiwanese or New York law applies to Section 5 of the Alcatel Note, the mere filing of a UCC–1 registration statement in Washington, D.C. failed to fulfill FLAG's obligation to take "all actions to the maximum extent permitted by applicable law" to perfect the collateral. Alcatel Note § 5. Appellants argue that the Bankruptcy Court's failure to determine whether FLAG could have perfected the Taiwan Collateral requires reversal, as the "maximum extent permitted" language placed a "very high burden," *Flag*, 320 B.R. at 769, on FLAG to achieve perfection. Moreover, appellants contend that, notwithstanding the language in Section 26(d) of the Security Agreement suggesting that WTC bore primary responsibility for locating a co-collateral agent in Taiwan, FLAG at all times retained the obligation to perfect the Security Interest.

FLAG responds that the Bankruptcy Court properly granted summary judgment, arguing both that its legal analysis was correct and, moreover, that reversal would be futile, as perfection was both legally and factually impossible. FLAG maintains that even if we were to find that FLAG was obligated to do more than file the UCC–1 registration statement in Washington, D.C., we should still affirm, as FLAG tried and failed to locate a Taiwanese entity willing to assist FLAG. Thus, FLAG argues, it was impossible for it to do any more than it did in its efforts to perfect the Collateral.

Underlying this dispute is the reality that perfection of the Collateral presented obvious practical difficulties. Both parties agree that registration of the Security Agreement in Taiwan was not permitted by law, and appellants do not dispute that FLAG made substantial efforts to enter into the type of co-collateral arrangement in Taiwan that appellants insist it was

required to. FLAG, however, contends that it was never required to find a co-collateral agent. Moreover, FLAG maintains that appellants bore the burden of informing FLAG and WTC of what course of action to take after FLAG contacted appellants seeking counsel on how to proceed in its perfection efforts in Taiwan.

The parties also dispute whether the phrase "applicable law," as used in Section 5 of the Alcatel Note, refers to New York law, as FLAG insists, or to the law in the country where perfection is sought. The Bankruptcy Court declined to decide this issue, finding that even accepting the appellants' interpretation that Taiwanese law applies, no issue of fact arose concerning FLAG's perfection obligations, as the agreements did not require FLAG to do anything more than file a UCC–1 registration statement regardless of which law applied. Appellants vigorously dispute this conclusion, citing as evidence FLAG's successful efforts to perfect in other Asian countries, as well as its extensive efforts to perfect in Taiwan. During oral argument, appellants' counsel maintained that, "FLAG recognized explicitly that perfection in Asia was a contractual obligation under the Alcatel Note." Tr. at 32. In support of this argument, appellants point to several emails sent by attorneys for FLAG and WTC relating to their perfection efforts in Taiwan. On January 2, 2003, WTC's counsel sent an email to Clinton Johnston, counsel for FLAG, stating that WTC "is in the process of engaging a Co–Collateral agent with an office in Taiwan to facilitate the perfection of Security Interests in the collateral for Secured Parties." Email of Sandra R. Ortiz, dated January 2, 2003. Five weeks later, FLAG's counsel sent a message to WTC's counsel stating that, "[i]n this security

grounds, there is no need to address these arguments.

agreement FLAG covenants to take steps necessary to perfect the security interest in each of the jurisdictions where the Collateral is located." Email of Clinton Johnston, dated February 11, 2003.

FLAG asserts that WTC's failed attempts to locate a co-collateral agent satisfy the "maximum extent" language, especially in light of JPMorgan's conclusion that Taiwanese law forbade the type of arrangement contemplated. JPMorgan's preliminary legal conclusions are not binding on this Court, however, especially when FLAG's own counsel sent an email reflecting his belief that a "co-collateral agency contract would be respected by Taiwanese law should it ever need to enforced." Email of Clinton Johnston, dated February 20, 2003. Appellants have presented evidence to this Court that although no such arrangement had ever been entered into at the time FLAG and WTC were soliciting potential co-collateral agents, since that time a similar arrangement has been successfully effected in Taiwan.[4] However, even if perfection were theoretically possible, it is entirely unclear whether: (1) a willing co-collateral agent could have been located; (2) whether an agreement could have been completed within the time frame provided for in the Alcatel Note, and; (3) whether the Taiwanese courts would have enforced such an agreement. These issues of fact must be evaluated before determining the appropriateness of summary judgment.

The Bankruptcy Court's holding rests on the premise that FLAG was only required to take action "upon written request of the Collateral Agent," which, in turn, could not take action "unless instructed in writing to do so by Alcatel or any of Alcatel's successors or assigns." Security Agreement §§ 5(a)(i) and 26(d). Although it is undisputed that the appellants did not request further action after receiving WTC's request for guidance on April 25, 2003, a genuine issue of material fact exists over the proper interpretation of these clauses in light of the obligation of FLAG to take "all actions to the maximum extent permitted by applicable law" under the Alcatel Note. The Security Agreement and the Alcatel Note were drafted to coexist; neither document may be read in isolation. Thus, on remand, the Bankruptcy Court should endeavor to determine how the parties intended for these seemingly contradictory clauses to operate in practice.

We emphasize that we are not suggesting that a motion for summary judgment might not eventually prove to be a proper means for the disposition of this case, whether the motion is made by the plaintiff or defendants, but only that it is not appropriate on this record. Without any factual findings both as to FLAG's obligations under the Alcatel Note and Security Agreement and as to the possibility of entering into an enforceable agreement with a co-collateral agent, summary judg-

---

**4.** Although there have been no changes in the relevant law, during the interim period between FLAG and WTC's attempts at finding a co-collateral agent and this later, successful attempt at doing so, Taiwan's Ministry of Finance issued a directive providing guidance on the use of a trustee to register a chattel mortgage. *See* Declaration of Anthony Minton Lo, n. 18. Moreover, FLAG's expert maintains that the factual circumstances of the later registration are sufficiently different to make it wholly distinguishable from the facts in this case. *See* Declaration of Arthur Shay. Thus, at the time that FLAG and WTC sought to enlist a co-collateral agent, it was far from clear whether Taiwanese law permitted parties to register a nonpossessory collateral security agreement between a Taiwanese entity and a foreign creditor operating through a co-collateral agent. However, assessing the likelihood that FLAG and WTC could have entered into an enforceable agreement under Taiwan law is an issue that must be resolved by the Bankruptcy Court.

ment is premature. In remanding, we are not deciding whether FLAG could have achieved perfection in Taiwan or whether New York or Taiwanese law should apply in determining FLAG's obligations under the Alcatel Note. Instead, we are remanding in order to permit the Bankruptcy Court to answer these questions, at which point the Bankruptcy Court may determine whether an issue of fact remains for trial.

■ On remand, the Bankruptcy Court must weigh the expectations of the parties at the time the relevant agreements were made against the reality of the Taiwanese legal landscape at the time FLAG sought perfection of the Collateral. Appellants' counsel conceded in oral argument that a "rule of reasonableness" must apply to the "maximum extent permitted by applicable law" language in the Alcatel Note. Tr. at 17. We agree that a rule of reasonableness must apply here, and urge the Bankruptcy Court to evaluate the parties' obligations under that standard.

Our decision also necessitates reinstatement of BNY's claims against FLAG, as BNY is the indentured trustee representing Series A Noteholders who are not names as plaintiffs here. Because the outcome of this case affects the rights of all Noteholders, its claims must be reinstated along with the appellants'.

## 2. Attorney's Fees

In a supplemental opinion, Judge Gropper denied FLAG's request for attorney's fees. FLAG cross-appealed this holding. Because we reverse and remand for further proceedings, however, it is inappropriate at this time to consider FLAG's cross-appeal.

### CONCLUSION

The Bankruptcy Court's grant of summary judgment to FLAG is vacated. The case is remanded to the Bankruptcy Court for proceedings consistent with this opinion.

**SO ORDERED.**